Keith DEAN and Cornelius Harper,
Appellants (Defendants Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 580S122.

Supreme Court of Indiana.

April 14, 1982.

Tony L. Axam, Robert Altman, Atlanta, Ga., Gary Granader, Detroit, Mich., Charles H. Graddick, Gary, for appellants.

Theodore L. Sendak, Atty. Gen., Palmer K. Ward, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendants (Appellants) after trial by jury were convicted of Kidnapping, Ind. Code § 35–1–55–1 (Burns 1975), Rape, Ind. Code § 35–13–4–3 (Burns 1975), and Robbery, Ind.Code § 35–13–4–6 (Burns 1975) and were sentenced to three concurrent terms, the longest of which is life imprisonment. This direct appeal presents the following issues:

(1) Whether Defendants were denied the effective assistance of counsel by virtue of being represented by the same attorney.

(2) Whether Defendants were denied their rights to a speedy trial.

(3) Whether Defendants were denied a fair trial because of prosecutorial misconduct.

(4) Whether the trial court erred in denying a motion for a new trial premised upon a claim of newly discovered evidence.

(5) Whether the trial court erred in refusing to admit the results of a polygraph examination at the hearing upon the Motion to Correct Errors.

(6) Whether the trial court erred in refusing to grant immunity to two witnesses at the hearing upon the Motion to Correct Errors.

(7) Whether the evidence is sufficient to sustain the convictions.

(8) Whether the trial court erred in refusing Defendants' tendered instruction upon the defense of misidentification.

(9) Whether the trial court erred in denying Defendants' Belated Motion to Correct Errors, which asserted that the Prosecutor used unconstitutionally obtained identification evidence and inadmissible hearsay to convict Defendants.

(10) Whether Defendants were denied the effective assistance of counsel.

The evidence most favorable to the State reveals that shortly after midnight on September 12, 1977, the prosecutrix drove her automobile into her driveway in Gary. A 1975 Ford station wagon entered behind her. She thought she recognized the station wagon and she left her vehicle and approached it. Two black males, who occupied the station wagon, requested directions to West Harrison. She "was immediately frightened" and "saw a bad situation" but gave the directions and acceded to the driver's request to come closer to demonstrate the directions on a map. At this time she "was scared to death" and knew she "was in a bad situation." Upon observing the driver "go for the car handle of his door," she jumped back into her vehicle. She locked her door and tried to back out, but the driver approached her with "a very large gun" and said, "this is a hold-up, get out of the car."

At that moment, she noticed the second male. The two forced her into their station wagon, after making sure that she had her purse. They rode through Gary for awhile, during which time both males emptied her purse, and she observed that the other male was also armed. When they came to a lonely stretch of road on 11th Avenue in Gary, the station wagon was stopped. The two males then took turns sexually assaulting her, and after consuming some wine, they left her near her home, at her request. As the station wagon departed, the prosecutrix observed the license plate and then ran to her parents' home, which was nearby, to summon the police. The entire incident lasted no more than an hour.

\* \* \* \* \* \*

## ISSUE I

Immediately prior to trial the following occurred:

"BY THE COURT: Which of you is Cornelius Harper?

"A. I am.

"Q. Stand by the microphone. You are Cornelius Harper?

"A. Yes.

"Q. In this cause and your co-defendant, Keith Dean, who is present in Court are each represented by the same attorney. There is a possibility when two defendants charged with the same offense are represented by the same attorney that a conflict could develop because your defense and that of your co-defendant might be different. That may not be the case. In any event, are you satisfied that both you and your co-defendant can be represented by the same attorney?

"A. Yes.

"Q. You waive any possible conflict that might develop in that regard?

"A. I don't understand your question.

"Q. Are you stating now in Court that you are satisfied that your defense and your co-defendant's defense are similar or the same and can be handled by one attorney?

"A. Yes.

"Q. You may sit down. Mr. Dean? Are you Keith Dean?

"A. Yes.

"Q. Did you hear the questions which I asked Mr. Harper?

"A. Yes.

"Q. Are your answers the same or different?

"A. They are the same."

At trial Defendants presented different alibi defenses. They point to a difference in the strengths of those defenses. Prior to trial a polygraph examination indicated that one Defendant knew something about the incident and the other did not. Thereafter, they claim that trial counsel, the court, and the State irrevocably tied their fates together so as to preclude the possibility of an individual defense. Also at trial Defendant Harper's alibi was severely weakened by a rebuttal witness. Defendants maintain that the impeachment of one alibi prejudiced the other.

■ The United States Supreme Court has recognized that a lawyer forced to represent co-defendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment. *Cuyler v. Sullivan*, (1980) 446 U.S. 335, 345, 100 S.Ct. 1708, 1716–17, 64 L.Ed.2d 333, 345. However, unless the trial court knows or reasonably should know that a particular conflict exists, it need not initiate an inquiry. *Id.* at 347, 100 S.Ct. at 1717–18, 64 L.Ed.2d at 346.

■ Though the circumstances which give rise to the claimed conflict of interest between Defendants were not brought formally to the trial judge's attention until after the trial, the relative difference in merit between their individual alibis was apparent during the presentation of evidence. "In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest

adversely affected his lawyer's performance." *Id.* at 348, 100 S.Ct. at 1718, 64 L.Ed.2d at 346–47.

Defendants, cognizant of the *Cuyler* standard, do not explain any of trial counsel's alleged inadequacies in terms of what would have been done differently if he had represented only one defendant and another lawyer had represented the other defendant. Defendants would have faced these same conflicts, with respect to the relative merits of their individual defenses, even if they had had separate counsel. We do not have before us a record which shows a lawyer who struggled to serve two masters and in the process may have compromised the interests of one, as occurred in *Wood v. Georgia*, (1981) 450 U.S. 261, 267–68, 101 S.Ct. 1097, 1101, 67 L.Ed.2d 220, 227–28 or *Glasser v. United States*, (1942) 315 U.S. 60, 75, 62 S.Ct. 457, 467, 86 L.Ed. 680, 702.

## ISSUE II

Defendants contend that they were denied their rights to a speedy trial under Ind.R.Crim.P. 4(C) and under the State and Federal Constitutions.

■ The record shows that trial counsel made no motion for discharge at any time prior to the trial, despite the seventeen (17) month incarceration of his clients. Appellate counsel, who also represented Defendants at the proceedings after trial, filed a motion for discharge pursuant to Rule 4(C) after the trial. Such a motion was not timely. A summary of the record as set out in the State's Brief shows that defense counsel acquiesced to the setting of trial for a date beyond the one year limit and thus waived his incarcerated clients' rights under Rule 4(C).[1] *Little v. State*, (1981) Ind., 415

---

1. "At the hearing on the belated motion to correct errors counsel for Appellants testified that they were not prepared to go to trial on July 24, 1978 as they had not taken the deposition of the prosecuting witness. In August, 1978 the trial was set on October 16, 1978 but counsel was due for some eye surgery and advised the Court and his clients that he would not be available, and the cause was continued until December 18, 1978. Counsel was unable, for physical reasons, to try the cause in December of 1978 and the same was continued until April 16, 1979. Sometime in December of 1978 counsel introduced Appellants to his partner, Mr. Daugherty and both advised that they wanted Mr. Daugherty to proceed with the understanding that Daugherty would consult with Mr. Katz. On April 16, 1979 the cause was continued, due to a congested calendar and reset for April 30, 1979. An objection was noted to this last continuance and overruled."

N.E.2d 44, 46; *State ex rel. Wernke v. Hendricks Superior Court*, (1976) 264 Ind. 646, 650, 348 N.E.2d 644, 647; *Snelling v. State*, (1975) 163 Ind.App. 546, 550, 325 N.E.2d 227, 230; *State v. Henry*, (1975) 163 Ind.App. 305, 323 N.E.2d 258. *See Utterback v. State*, (1974) 261 Ind. 685, 687, 310 N.E.2d 552, 553–54.

In their brief, Defendants attach some significance to trial counsel's April 16, 1979 objection to a continuance until April 30, 1979, the date of trial; however, the ground for the continuance, a congested calendar, is specifically provided for by Criminal Rule 4(C). *Fortson v. State*, (1978) 269 Ind. 161, 166, 379 N.E.2d 147, 151.

█ In determining whether or not there has been a constitutional violation of the right to a speedy trial, the court must consider the length of the delay, the reason for the delay, the defendant's assertion of his right, and the prejudice, if any, to the defendant. *Barker v. Wingo* (1972) 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117. The task of balancing these factors is a difficult one; however the United States Supreme Court appears to assign great weight to the third factor:

> "We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 117–18.

█ Defendants argue very forcefully that they were severely prejudiced by the delay. During their incarceration they matured in age, height, and weight, so that at the time of trial they perfectly matched the prosecutrix's descriptions of her assailants. At the time of the incident, Defendants were two years younger, and each was approximately six inches shorter, and forty pounds lighter. Also at trial, Defendant Harper's alibi witnesses could not remember the exact date upon which he had been in a fight and had sustained a very noticeable injury to his mouth. The prosecutrix admitted that she was close enough to her assailants to see their faces but she did not see any bruise or notice anything unusual on their faces. Additionally, she testified

that her memory of the event had improved with time and that she was more certain of her assailants' identities at trial.

Against the prejudicial effect of the delay we must weigh a record, which shows that continuances were had with the knowledge and agreement of Defendants and at the behest of defense counsel, for personal reasons—he was not prepared for trial and he was later not available for trial—and by reason of a congested calendar. We cannot say that these continuances were unduly long under the circumstances. Defense counsel deposed the prosecutrix during one continuance and the other was necessitated by his eye surgery and recuperative difficulties. The record shows that Defendants were aware of trial counsel's eye problems, and that they did not assert to the trial court that they were dissatisfied with his representation prior to trial. Issue I, supra.

In their Brief Defendants would have us attribute their delay in coming to trial "to indifference on the part of the bureaucracy responsible for bringing the case to trial." They make much of the State's standing by as the case was delayed, which delay, from the point of view of hindsight, gave the State what it lacked the most, Defendants who matched the victim's descriptions of her assailants. However, Defendants do not tell us what tactics the State should have used in responding to trial counsel's requests for continuances. They cite no authority, and we have found none, which requires the State to oppose defense counsel's request for a continuance, as part of its obligation to bring the defendant to trial in a timely manner. In light of these circumstances, we cannot say that Defendants were denied their constitutional rights to a speedy trial.

## ISSUE III

During the Prosecutor's closing argument the following occurred:

> "Mr. Daugherty wanted you to put yourself in her shoes, and I ask all you women if you were in that situation, would you remember those?

"BY MR. DAUGHERTY: I would object. The prosecutor is picking out specific members of the jury. The statement of you women is highly inflammable, and I would move for a mistrial.

"BY THE COURT: Motion for mistrial is denied.

"BY MR. DAUGHERTY: All the jurors are supposed to listen. Not just the women.

"BY MR. OLSZEWSKI: *I haven't finished my statement. If you men had to watch your wives, watch your wife or children be raped, could you forget those faces? Wouldn't you live with those faces for all your life and wouldn't you want justice done? * * *"* (emphasis added).

Defendants contend that the trial court erred in failing to instruct the jury regarding these improper comments. From Defendants' Brief we learn that their argument addresses both the comments, to which trial counsel objected, and the italicized comments, to which trial counsel did not object.

■ The italicized comments were inflammatory and unnecessary. *See Remsen v. State*, (1981) Ind., 428 N.E.2d 241, 244–45; *Adler v. State*, (1967) 248 Ind. 193, 198–99, 225 N.E.2d 171, 174 (per curiam); however, trial counsel did not object to them, and Defendants cannot now complain.

■■ The denial of a motion for mistrial will be reversed only upon a showing of an abuse of discretion by the trial court. Only if the statement was so prejudicial as to have placed the defendant in grave peril, must the case be reversed. *Morse v. State*, (1980) Ind., 413 N.E.2d 885, 889.

■ Defendants ask us to apply *Flynn v. State*, (1978) Ind.App., 379 N.E.2d 548 where during closing argument the prosecutor referred to the defendant—"He is a drug dealer, * * *." The Court of Appeals applied the rule that the prosecutor should not make statements which are not supported by the evidence. The court found that the evidence of the defendant's posses-

sion of a controlled substance was close and that the prosecutor's comment may have suggested to the jury that he possessed undisclosed evidence bearing upon other possible crimes by the defendant. These factors compelled reversal.

In the case at bar, the evidence is in conflict; however, the prosecutor's comments do not suggest that he possessed undisclosed evidence which showed that Defendants were rapists, robbers, or kidnappers. Additionally, the usual method for countering such asserted misconduct is an admonishment to the jury instructing it to disregard the remarks. The record shows that trial counsel moved for a mistrial; however, he did not seek an admonishment, and therefore, the trial court's failure to admonish is not available for review. *Stacker v. State*, (1976) 264 Ind. 692, 697, 348 N.E.2d 648, 651.

### ISSUE IV

■ Defendants next contend that the trial court erred in denying a new trial motion based upon newly discovered evidence. To sustain a claim for a new trial based on newly discovered evidence, a defendant must show (1) that the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that it could not, by due diligence have been discovered in time for trial; (7) that it is worthy of credit; (8) that it can be produced upon a re-trial of the case; and (9) that it will probably produce a different result. *Bradburn v. State*, (1981) Ind., 425 N.E.2d 144, 146.

On May 15, 1979, approximately two weeks after the guilty verdicts were returned, Larry Harper, Defendant Harper's older brother, and Richard Pickett gave tape recorded statements to defense counsel in his office. These statements contain a detailed account of the incident in which they claim to have engaged in consensual sexual intercourse with the prosecutrix in a stolen station wagon. The typewritten transcript of these statements, some thirty

(30) pages, was attached as exhibits to counsel's Motion to Correct Errors. They are preceded by an affidavit of trial counsel, which attests to their authenticity. Each statement is also preceded by a form affidavit; however, the forms are blank with respect to Harper's and Pickett's signatures, dates, and oaths.[2] In the statement, Larry Harper states that he was aware that his brother had been summoned to the juvenile court for the rape, kidnapping, and armed robbery of the prosecutrix.

At the hearing on the Motion to Correct Errors on August 14, 1979, Larry Harper testified. He stated that he was eighteen, and upon being asked about his familiarity with the facts surrounding the offenses, the trial court interrupted and explained his right to counsel and his privilege against compulsory self incrimination. Harper waived his right to consult with an attorney and was then questioned about the incident. Harper admitted that on the night of the incident he was in the company of Richard Pickett and the prosecutrix in a yellow station wagon. When asked who drove the car, he invoked the Fifth Amendment. He then stated that he had met the prosecutrix in a driveway as she was getting out of her automobile. When asked whether or not he talked to the prosecutrix when she was in her car, he again invoked the Fifth Amendment.

Harper then testified that the prosecutrix entered the station wagon, stated that she was intoxicated and asked them to take her to a restaurant to obtain some coffee. Harper was asked whether he had mentioned a girl friend to the prosecutrix, because in his out of court statement he had said that he had mentioned the rape of his girl friend, immediately after the copulation and had admonished the prosecutrix not to cry "rape" later on. He replied in the affirmative but invoked the Fifth Amendment when requested to relate what he had said to the prosecutrix.

Harper next related that the prosecutrix had sat in the middle in the front seat, that

Pickett had intercourse with her first, then he had intercourse with her, and at her request, they left her about a block from her house. He also added that the prosecutrix wore a blue pant suit and blue earrings and had balloons in her car.

On cross-examination, Harper stated that he is an auto mechanic. The State then showed him the typewritten transcription of his statement of May 15, 1979 and asked if he had made the statement. He invoked the Fifth Amendment and stated:

"A. Well, these papers here, my name hasn't been signed on, and I don't have to agree to nothing it's on."

Defense counsel then requested immunity for the witness, and the trial court's denial thereof is assigned as error in Issue VI, below. Thereafter, Harper reiterated his claim that the prosecutrix had suggested sexual intercourse to him and appeared to be intoxicated. He then testified as follows:

"Q. The information, the charging information in this case, Mr. Harper, is in three paragraphs alleging the crimes of kidnapping, count one, rape, count two, and robbery, count three. These are the crimes for which Cornelius Harper, your brother, and Keith Dean were convicted. Do you understand that, sir?

"A. Yes, I do.

"Q. Did you in reference to count one, kidnap and decoy and imprison and carry off (the prosecutrix) on September 13, 1977?

"A. No, I didn't.

"Q. Did you sir in reference in count two, commit the crime of rape, having sexual intercourse with (the prosecutrix) against her will with violence?

"A. No, I didn't.

"Q. Did you, sir, in count three of the information, take from the control and custody of (the prosecutrix), certain articles in value of money, fifteen dollars, then and there being the offense of robbery?

---

2. The record also contains an affidavit by Richard Pickett of July 10, 1979 in which he states

that Larry Harper and he had sexual intercourse with the prosecutrix.

"A. No, I didn't.

"Q. You are not now, nor have you ever confessed or admitted to those crimes, have you, sir?

"A. Repeat that again.

"Q. You are not now, or have you ever confessed to having committed those crimes?

"A. That's true.

"Q. Kidnap, robbery—

"A. That's true.

"Q. And rape, the crimes for which your brother and the other man were convicted?

"A. No."

Harper also stated that he had discussed the incident of sexual intercourse with his brother, when he learned that his brother had been summoned to juvenile court. He also discussed the matter with Defendant Dean:

"Q. Have you ever spoken to Keith Dean, the young man, about this case about what happened and didn't happen and so forth?

"A. No, I didn't. Not after the summons. He know about it. When it first happened, we told him we had gotten over on a white chick.

"Q. Was that the same day or the next day after you had gotten over on a white chick?

"A. It was the next day.

"Q. What did Keith Dean say?

"A. He just laughed."

Upon being called to the stand, Richard Pickett invoked his right to remain silent and refused to answer defense counsel's questions.

On cross-examination he was shown the typewritten transcript of his alleged confession, and while he admitted that he talked to trial counsel, he invoked the Fifth Amendment when asked if he had made the statement. When asked if he had committed the crimes with which Defendants were charged, he again invoked the Fifth Amendment, whereupon defense counsel requested, but was denied, immunity for the witness. When asked if he had ever seen

the prosecutrix, who was present in court at the hearing, he again invoked the Fifth Amendment.

Defendants also presented Arthur Bland, President of the Gary chapter of the N.A.A. C.P. He testified that Larry Harper and Richard Pickett had come to his office and had admitted their involvement. The trial court, on its own motion, recalled Larry Harper, and the following transpired:

"Q. My question then is knowing that your brother and another young man that you know remained in jail all that time for a crime which you say you know they did not commit, why didn't you come forward during that year and a half and tell someone about it?

"A. Because I thought they were going to be found innocent.

"Q. In other words, it didn't bother you that they had to sit in jail for a year and a half and because you thought they would be found not guilty anyway? Is that what you mean?

"A. Personally, it's just something that had happened, and it didn't bother me too much about them being in jail. If they hadn't been messing up, I don't think the police would have come to them in the first place.

"Q. Messing up on other matters?

"A. Yes, yes.

"Q. And you didn't feel any compulsion to come forward and admit and say anything about your involvement until after they were convicted, is that right?

"A. That's right."

 In post conviction proceedings Defendant bears the burden of proving his contentions by a preponderance of the evidence. *Lamb v. State*, (1975) 263 Ind. 137, 143, 325 N.E.2d 180, 183. The trial judge, as trier of the facts, is the sole judge of the weight of the evidence and the credibility of the witnesses. *Rufer v. State*, (1980) Ind., 413 N.E.2d 880, 882. Defendant stands in the position of one appealing from a negative judgment. In such cases, it is only where the evidence is without conflict and leads to but one conclusion, and the

trial court has reached an opposite conclusion, that the decision will be disturbed as being contrary to law. *Popplewell v. State*, (1981) Ind., 428 N.E.2d 15, 16.

In denying the motion for a new trial the trial court ruled as follows:

"2) Defendant's argument for a new trial based upon newly discovered evidence does not satisfy all of the necessary elements as stated by the Supreme Court of Indiana. In *Tungate v. State*, [238 Ind. 48] 147 N.E.2d 232 (1958) and *Emmerson v. State*, (sic) [259 Ind. 399] 287 N.E.2d 867, 872 (1972), in that the evidence presented by defendants did not show conclusively that 'due diligence was used to discover it in time for trial' and that the Court cannot conclude on the basis of the testimony presented that said evidence 'would probably produce a different result at any retrial.'"

 From the record, the trial court could reasonably have found that Larry Harper had informed Defendants of this "newly discovered evidence," i.e. his and Richard Pickett's complicity, prior to trial. A defendant in possession of evidence, who fails to present it at trial, may not thereafter use it as a basis for a new trial. *Riddle v. State*, (1980) Ind., 402 N.E.2d 958, 961.

## ISSUE V

At the hearing on the Motion to Correct Errors, Defendants offered the testimony of two polygraphers from a firm in Chicago. Harry Reed administered a polygraph examination to the defendants. In an offer to prove, he stated his opinion that when they denied their involvement in the offenses, they were telling the truth. Also after trial, James Bobal administered polygraph examinations to Larry Harper and Richard Pickett. In an offer to prove he stated his opinion that when they admitted that they had sexual intercourse with the prosecutrix, they were telling the truth. In response to Defendants' motions to admit the testimony of the examiners and the results of the examinations, the trial court ruled as follows:

"Let me try to explain the way that I feel. I have to rule on your offered testimony. I don't know how reliable, gentlemen, your science is. I am told by reading the cases from the Appellate and Supreme Court of this State that in order to accept what is called newly discovered evidence I must only look at evidence which is not privileged or incompetent and that can be produced upon retrial. There is a point which alludes to that. Our Courts have consistently held that polygraph evidence is inadmissible unless the State of Indiana will give you a waiver and both parties stipulate to its admissibility. Therefore, I guess we judges also advise juries in our instructions that they are not at liberty to disregard the law or set it aside for any reason. We also have to give ourselves that instruction. We are not privileged to set aside the law or disregard it. For that reason I have to hold that testimony that would be given by the lie detector people is inadmissible for the purposes of this hearing."

Defendants cite *Reid v. State*, (1972) 259 Ind. 166, 285 N.E.2d 279; *Slagel v. State*, (1979) Ind.App., 393 N.E.2d 798; *Ross v. State*, (1977) 172 Ind.App. 484, 360 N.E.2d 1015, and *United States v. Infelice*, (7th Cir. 1974) 506 F.2d 1358, *cert. denied*, (1975) 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 802 in support of a request to instruct the trial court that it had discretion to admit this evidence.

 Because the lie detector has not been demonstrated to be sufficiently reliable, the results of a polygraph examination of a witness or a party are inadmissible in a criminal prosecution, absent a proper waiver or stipulation by the parties. *Kimmel v. State*, (1981) Ind., 418 N.E.2d 1152, 1157 (cases cited therein). If such a waiver or stipulation is made, only then does the trial court possess discretion to admit or to exclude polygraph evidence. *Pavone v. State*, (1980) Ind., 402 N.E.2d 976, 979. The rule that we follow is not the same as that followed by the Seventh Circuit Court of Appeals, as expressed in *United States v.*

*Infelice, supra,* and *United States v. Rumell,* (7th Cir. 1981) 642 F.2d 213, 215 (cases cited therein). An examination of Defendant's citations reveals that a proper stipulation and waiver were found to exist in *Reid* ; error with respect to the admission of polygraph evidence was waived in *Ross,* and an unsuccessful attempt at waiver was found in *Slagle.* Without the agreement of the State, none of the evidence offered concerning the polygraph examination would have been admissible upon a retrial of this cause; however, it appears from their Brief that Defendants offered this evidence for another purpose:

"However, the Appellants do not offer the polygraph examination results to be offered at trial, instead, the results were offered to support the granting of a new trial based on the newly discovered evidence of Messrs. Harper and Pickett."

Even if we were to hold that the exclusion of such evidence was error, it was clearly harmless. While the polygraph evidence might be relevant to determining the weight to be given Larry Harper's and Richard Pickett's testimony, it would not have affected the finding that the evidence alleged to be newly discovered was, in fact, not newly discovered. Issue IV, *supra.*

### ISSUE VI

 At the hearing on the Motion to Correct Errors, Defendants requested immunity for Larry Harper and Richard Pickett when they began to invoke the Fifth Amendment. The trial court denied the request.

Defendants argued that the trial court has inherent authority to protect the right to present exculpatory and essential defense evidence by conferring use immunity. They ask us to follow precedents from the United States Court of Appeals for the Third Circuit, e.g., *Virgin Islands v. Smith,* (3rd Cir. 1980) 615 F.2d 964, which recognize this inherent power of federal courts. They acknowledge that other federal appellate courts explicitly reject the existence of this power. *United States v. Lenz,* (6th Cir. 1980) 616 F.2d 960, 962, *cert. denied,* (1980)

447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124; *Ellis v. United States,* (1969) 135 U.S. App.D.C. 35, 40–41, 416 F.2d 791, 796–97.

Defendants have not presented us with a record disclosing that they were deprived of exculpatory evidence *at trial* as occurred in *Virgin Islands v. Smith, supra* or *Chambers v. Mississippi,* (1973) 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297. The alleged exculpatory testimony was deprived them at a post conviction hearing; however, the substance of that exculpatory evidence, the out of court statements of Larry Harper and Richard Pickett, was before the trial court in the form of exhibits attached to the Motion to Correct Errors. Upon this state of the record the trial court was able to weigh the conflicts in the evidence. For example, the prosecutrix testified that her assailants were armed, whereas Larry Harper stated that he was unarmed. Even if "use" immunity had been conferred and the witnesses had testified in accordance with their statements, under our standard of review for post conviction proceedings, such testimony would not have affected the finding that their potential testimony was known to Defendants prior to trial.

### ISSUE VIII

 Defendants contend that the trial court erred in refusing their tendered instruction No. 5:

"Where the prosecution has offered identification testimony, i.e., the testimony of an eyewitness that she saw the defendants commit the acts charged, such testimony should be received with caution. An identification by a stranger is not as trustworthy as an identification by an acquaintance. Mistaken identification is not uncommon. The witness' opportunity to observe the perpetrators during the commission of the act charged is of great importance in determining the credibility of her identification. The testimony of the witness that she is positive of her identification may be considered by you, but does not relieve you of the duty to carefully consider her identification testimony and to reject it if you find

that it is not reliable. Careful scrutiny of such testimony is especially important when as in this case, it is the only testimony offered by the prosecution to connect the defendants, Keith Dean and Cornelius Harper with the acts charged."

In *Lewis v. State*, (1977) 266 Ind. 371, 363 N.E.2d 1230, we treated a similar claim:

"The sole question raised by this appeal is whether or not the trial court erred in failing to give appellant's tendered instruction number 10. Said instruction reads as follows:

'The evidence in this case raises the question of whether the defendant was in fact a criminal actor and necessitates your resolving any conflict or uncertainty in testimony on that issue.

'Personal identification evidence is doubtful at best and should be subject to close scrutiny. It is naive to say that any person could be absolutely certain of the identification of another person whom they had never known previously and had observed only in a brief period of excitement and great tension. All testimony of such a nature should be closely scrutinized by the jury so that it may properly evaluate its contents.'

"The language of this instruction is taken from the case of *Stinson v. State* (1974), 262 Ind. 189, 313 N.E.2d 699. There were two victims to the armed robbery, one of whom testified that he did not get a clear look at the robber and was thus unable to make a positive identification. The other victim testified that she did get a good look at the robber during the course of

the robbery and that she later identified the appellant from photographs exhibited to her by the police department. She also made a positive in-court identification of the appellant.

"Because of the presence of this personal identification at the trial, the appellant claims he was entitled to the tendered instruction number 10. The language in the *Stinson* case was not intended by the Court to be a stock instruction in criminal cases. The language was written in holding that there was no violation of due process in admitting in-court identification so long as competent and thorough examination of the witness was available to test the doubts and uncertainties which the witness might have concerning identification. Appellant claims the content of instruction number 10 was not covered by other instructions. However an examination of the record in this case discloses that appellant's instructions numbered 2, 3, 6 and 8, which were given by the court, cover the general subject of burden of proof, the credibility of witnesses and the weight of the evidence. This was the type of instruction to which the appellant was entitled on this subject. To the extent that appellant's instruction number 10 could be construed as being a proper statement of the law, it was covered by other instructions given; therefore, the refusal of the trial court to give the instruction number 10 was not error."

In the case at bar, the trial court gave Instructions numbers 10,[3] eleven,[4] and thir-

---

**3.** "The doctrine of reasonable doubt is a practical rule of law to guide you in your jury duty. No person charged with a crime for which he is on trial shall be convicted until the evidence in the case establishes his guilt beyond a reasonable doubt.

"A reasonable doubt is not any doubt whatsoever, but is a doubt based upon reason and common sense. It is a doubt for which a reason can be given, arising from a fair and impartial consideration and weighing of all the evidence in the case. It must be based upon the evidence or lack of credible evidence. Therefore, the jury has no right to go beyond the evidence to find reason for acquitting the defendants neither has the jury any right to act

upon a mere whim or speculation, nor to convict upon a mere possibility of guilt.

"If you become convinced beyond a reasonable doubt of the defendants' guilt, as charged, then it will be your duty to so find and return a verdict of guilty. But on the other hand, if you shall not become convinced beyond a reasonable doubt of the defendants' guilt as charged, then it will be your duty to find the defendants not guilty and return a verdict of not guilty."

**4.** "You are the sole judges of the credibility of the witnesses and of the weight to be given to their testimony. In determining the credit you will give to a witness and the weight you will give to the testimony of witnesses, you may take into consideration their conduct and de-

teen,[5] which covered the general subject of burden of proof, credibility of witnesses, and weight of the evidence.

Defendants complain that the jury was not instructed upon their defense of misidentification; however, nothing in the record suggests that trial counsel was in any way, prohibited from arguing to the jury the weaknesses of the prosecutrix's identification testimony. Upon the authority of *Lewis, supra,* the trial court committed no error in refusing this instruction.

### ISSUE IX

Defendants next contend that the trial court erred in denying, without reasons, their Belated Motion to Correct Errors based upon two impermissibly suggestive pretrial identification procedures and two in trial errors, which we explain below.

### A & C

On November 3, 1977 the prosecutrix viewed an array of thirty-nine photographs. They included some photographs which the prosecutrix had selected from three school yearbooks that she was shown. Only five of the photographs, including those of Defendants, are in color. The rest are photographs of wallet size pictures, a wallet size photograph, and mug shots. The first mention of these photographs at trial was made during the cross-examination of the prosecutrix. Thereafter, Detective Mitchell, during the State's case in chief, described the November 3, 1977 pretrial identification:

"A. Yes, I handed (the prosecutrix) a stack of photographs and instructed her to begin looking through the photographs to see if she could identify either of the defendants. She proceeded to start looking through the photographs and came to the fifth photograph in the stack and threw the photograph on my desk and said that was one of them. I instructed her to continue, and she went to the thirteenth photograph and pulled that one out, threw it over to my desk and said that's one, and I said continue to look, and she continued.

"Q. Who were the photographs she threw on your desk?

"A. The defendants."

Defendants tendered the following objection:

"BY MR. DAUGHERTY: Your Honor, at this point in time I would object to any further questions or testimony concerning where these two particular photographs were obtained and what manner they were obtained. First of all that particular evidence would be irrelevant and immaterial. Furthermore, we believe that the State of Indiana would attempt to show that the photographs were obtained from the Juvenile Detention Center."

■ The objection of irrelevant or immaterial preserves nothing for review on appeal. *Lucas v. State,* (1980) Ind., 413 N.E.2d 578, 583; *O'Conner v. State,* (1980) Ind., 399 N.E.2d 364, 366.

■ Defendants assert that the photographic array was unnecessarily suggestive; however the record does not show any objection was made, at trial, to the prosecutrix's testimony or Detective Mitchell's tes-

meanor while testifying; their interest, if any, or want of interest in the result of the trial; their motive, if any in testifying; the witness' relation to or feeling for or against the defendants or the injured party; the probability or improbability of their statements; their opportunity to observe and know of the matters of which they testify; their inclination to speak the truth or otherwise as to matters within their knowledge; and all other facts and circumstances in evidence which in your judgment may affect their testimony, giving to each witness such credit and to the testimony of each witness such weight and value as you shall find it entitled to."

5. "You will understand that you and you alone as jurors are to determine the weight and credit to be given to the testimony of witnesses, these are things for you to determine in your search and endeavor to find the truth of the case and your final decision must rest solely upon the law and the evidence of the case without any reference to the probable consequences to either side. The Court has no right to assume or indicate whether any fact or facts have been established or not and if the Court has in any manner so done, you will disregard that and find the facts for yourselves."

timony upon this ground. *Stubblefield v. State*, (1979) Ind., 386 N.E.2d 665, 667.

Defendants also urge that Indiana law comports with that of other jurisdictions, e.g., *State v. DeGraffenreid*, (1972) Mo., 477 S.W.2d 57, 63–64; *People v. Trowbridge*, (1953) 305 N.Y. 471, 113 N.E.2d 841, which prohibit third persons, usually police officers, who were present at a pretrial identification procedure, from bolstering the victim's in-court testimony concerning that pretrial identification procedure. We followed such a rule in *Thompson v. State*, (1944) 223 Ind. 39, 43, 58 N.E.2d 112, 113 and overruled *Thompson* in *Johnson v. State*, (1972) 258 Ind. 383, 281 N.E.2d 473, 476. The facts of *Johnson* which involved the victim's relating the pretrial identification procedure, were not the same as in *Thompson*, and our unnecessarily broad comments might be reconsidered upon presentation of a proper record. *But see Lottie v. State*, (1980) Ind., 406 N.E.2d 632, 638–39 (allowing police officer to relate victim's out of court identification of a photograph over hearsay objection and a claim that the right of confrontation was denied, where the victim testified). Nevertheless, and notwithstanding that the State's case was not "open and shut," *People v. Trowbridge, supra*, the record reveals no objection to Detective Mitchell's testimony upon this or any closely related ground. Therefore, this claim of error is unavailable for review. *Stubblefield v. State, supra.*

### B

At trial the prosecutrix testified as follows about a juvenile waiver hearing held November 30, 1977:

"Q. And in reference to the hearing on November 30th that Mr. Daugherty is referring to at that time did you have occasion to see your two assailants in person?

"A. Yes, I did.

"Q. Are those the same two people that you saw then that you have identified today?

"A. Yes, they are."

The transcript of the juvenile waiver hearing contains the following question asked of the prosecutrix by the State:

"Q. O.K. When you came to the Court Room today, you were talking to Officer Mitchell and your mother, two youths were brought in the Court Room. I asked you if you had any doubt in your mind as to whether or not these are the same youths that raped you and what was your response?

"A. I don't have any doubt in my mind."

█ Defendants contend that a one-on-one pretrial confrontation occurred at the waiver hearing, without counsel's knowledge and at a time when the right to counsel had attached. *Hatcher v. State*, (1981) Ind., 414 N.E.2d 561, 563. We agree, and we see no distinction between what occurred here, and what occurred in *Moore v. Illinois*, (1977) 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424, where Defendant, without counsel, was identified by the victim at a preliminary hearing. Although the defendants, in the case before us did have counsel present, he did not know that there was to be a confrontation with the victim. In *Moore*, where the Court reversed, the victim related her pretrial identification at trial, over objection; however in the case at bar, trial counsel did not object when the prosecutrix testified about the preliminary hearing. Therefore, the asserted error is unavailable for review. *Stubblefield v. State, supra.*

### D

During closing argument the prosecutor repeatedly referred to the quality of the prosecutrix's identifications:

" * * * she sat on that witness stand and *positively* identified these two defendants * * * "

" * * * on Nov. 30th of 1977, in person in a hearing in Gary, she *positively* identified these two defendants * * * "

" * * * she came to court and told you *positively* that these two defendants * * "

"We have the *positive* identification on November 30th * * * "

█ Defendants argue that there is no evidence to support the prosecutors com-

ments that the prosecutrix was "positive" in her identifications. While it is improper for the prosecutor in closing argument to refer to matters not in evidence, trial counsel failed to object to these comments and failed to request an admonition to the jury to disregard the comments. Upon this record the asserted error is unavailable for review. *Shepler v. State*, (1980) Ind., 412 N.E.2d 62, 69.

### E

 Defendants argue as follows:

"The post-conviction court did not make specific finding of fact or law in its decision denying the Belated Motion to Correct Errors which raised their objections to the identification testimony and other issues. The court's failure to do so creates problems for appellate courts' review and is error. *Moffett v. State*, (1979) Ind.App., 398 N.E.2d 686; *Love v. State*, (1971) 257 Ind. 57, 272 N.E.2d 456."

Both *Moffett* and *Lane* rely upon Ind.R. P.C. 1, section 6, which provides:

"The court shall make specific findings of fact, and conclusions of law on all issues presented, whether or not a hearing is held. * * *"

The Belated Motion to Correct Errors is a creature of Ind.R.P.C. 2 which provides in pertinent part:

"If the trial court finds such grounds, it shall permit the defendant to file the motion, and the motion shall then be treated for all purposes as a motion to correct error filed within the prescribed period."

Thus, the Belated Motion to Correct Errors, while post conviction in nature, is governed not by Ind.R.P.C. 1, but by Ind.R. Tr.P. 59, which does not contain a directive to the trial court to make findings of fact and conclusions of law in support of its ruling on the motion. Even if the trial court had erred, we have had no difficulty in learning from the record that the alleged errors were not preserved for review.

### ISSUE X

Lastly, Defendants contend that they were denied the effective assistance of counsel because 1) counsel failed to move to suppress the improper one on one confrontation at the juvenile waiver hearing, Issue IX B, supra; 2) counsel failed to move to suppress the improper photographic identification of November 3, 1977, Issue IX A, supra; 3) counsel failed to object to Detective Mitchell's testimony, Issue IX C, supra; 4) trial counsel did not object to prosecutor's improper final argument, Issue IX D, supra; 5) counsel failed to file a motion for discharge, Issue II, supra; and 6) in general counsel failed to expedite the investigation and trial of the case.

At a hearing upon these allegations, Attorney Katz, who initially represented Defendants, provided six pages of narrative testimony with respect to the reasons for the delays until December, 1978, when James Daugherty, Mr. Katz's partner, assumed the matter. By that time trial was set for April 16, 1979.

From Katz's testimony the trial court could reasonably have found that the defendants, who were in jail, knew about the delays and acquiesced in the delays, some of which were not foreseeable. Katz stated that he had been told to anticipate an eight (8) week recovery period from corneal transplant surgery. Complications extended that period, and in December, when Katz was in serious condition, he turned matters over to Daugherty, in a meeting at the Lake County Jail, in which he, Daugherty, and Defendants were present. At that time Defendants indicated that they wanted Daugherty to continue representing them and to go forward with the case.

Katz also testified about the remainder of the asserted failings. He explained that his strategy was to allow the pretrial identifications into evidence:

"Q. If I understand you correctly, it was your judgment based upon your investigation that you could not totally defeat the in-court identification as is sometimes done, is that correct?

"A. That is right. I also felt that the out-of-court identification utilized was very favorable to the defendants and I did not want to defeat those, I wanted those admitted. I felt that the discrepancies between her original statement to Officer Stence (phonetics) as to height, I felt that the lack of a line-up, her written notes or written note to the affect that she had picked out approximately thirty-seven (37) other people as looking like one or both of the defendants, I felt that that was extremely favorable to the defendants and that that would contribute to establishing a reasonable doubt as to the question of guilt at the time of trial.

"Q. I understand then that the evidence itself of identification could be used, under your theory, against the State to attack the strength of the State's case itself?

"A. That is correct. * * *"

It appears that Mr. Daugherty followed through with this strategy at trial.

Katz also related his pretrial investigation, which consumes 6½ pages of narrative testimony. His preparation included interviewing the defendants and the witnesses and the administration of polygraph examinations to Defendants on January 6, 1978:

"* * * Based upon the results of the polygraph I interviewed both of them, I told them both of them at the time, that based on the polygraph results it was my feeling number one that either they had committed the offense or they knew who did commit it. I believe that the results as to one of the defendants was that he was not telling the truth in his answers to certain questions posed him, with the other defendant the answers were inconclusive. Both defendants professed their innocense (sic) and indicated that they did not know who committed the crime with which they stood charged."

Mr. Daugherty corroborated Mr. Katz's testimony and strategy and related the following:

"A. Cornelius Harper asked Mr. Katz and myself if the State of Indiana would have a case against them if something happened to the complainant, * * *, if she did not show up at court.

"Q. What, if anything, did you and Mr. Katz reply?

"A. I indicated that she is the primary witness in the case and that the State's case was based upon her testimony, at which point Cornelius Harper and Keith Dean remained silent. Cornelius Harper indicated that he would have his people, either he used the word, I believe, 'do something to her.' At that point, I told them to be quiet, I didn't want to hear any further conversation about what the defendants or their family might do to the complaining witness.

"I indicated that it would be totally wrong for them to have anything done, and because I am an officer of the court, I had a duty to contact—Mr. Katz and I had a duty to contact the Judge, which Mr. Katz did and recited this portion of —"

The evidence supports the trial court's ruling and shows that Defendants had counsel who prepared their case and litigated the cause with a preconceived plan of action. The verdicts disclose that the plan did not succeed; however, an acquittal is not the yardstick by which the adequacy or effectiveness of representation is measured. Defendants bore the burden of rebutting the presumption that their attorney was competent, *Rodgers v. State*, (1981) Ind., 415 N.E.2d 57, 58. Not only does the evidence not compel a finding of inadequate representation, it is supportive of the presumption. Defendants did not meet their burden upon this claim.

We find no reversible error. The judgment of the trial court is affirmed.

GIVAN, C. J., and DeBRULER, HUNTER and PIVARNIK, JJ., concur.