Rufus Lee AVERHART, Ralph Dennis Hutson, and David North, Appellants,

v.

STATE of Indiana, Appellee.

No. 1182S414.

Supreme Court of Indiana.

Oct. 29, 1984.

Rehearing Denied Dec. 26, 1984.

Stephen C. Bower, Kentland, for Rufus Lee Averhart.

Robert W. Hammerle, Indianapolis, for Ralph Dennis Hutson.

Eugene C. Hollander, Indianapolis, for David North.

Linley E. Pearson, Atty. Gen., Joseph N. Stephenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

These three Appellants were charged jointly in the Lake Criminal Court with the crimes of murder, and murder in the perpetration of robbery. Change of venue was granted to the Allen Superior Court and there all three were found guilty of both murder and felony murder. The death sentence was sought for all three defendants but the jury recommended death for Averhart only. The trial court found that sentence could be imposed for only one of the convictions and subsequently sentenced North and Hutson to a term of sixty (60) years. It was the judgment of the trial court that Averhart suffer the penalty of death.

All three appellants appeal through their attorneys and file separate briefs herein. Averhart has also filed his own *pro se* briefs. For purposes of review and disposition of this cause we consolidate all three of the causes for this appeal.

Two issues relate to North only and those are: (a) error of the court in refusing to give an instruction for manslaughter; and (b) error in sentencing defendant North.

Errors raised by all three of the appellants in various combinations that will be indicated in each issue are:

1. error occurring with respect to arrest and filing of information;
2. defect in the grand jury indictment;
3. denial of a motion for severance of defendants for purposes of trial;
4. representation of all defendants by counsel from the Lake County Public Defender's office;
5. issues in the *voir dire* and handling of the petit jurors;
6. error in advising the jury that their verdict was advisory or a recommendation;
7. improper admission of photographs of the victim;
8. forcing defendants to wear ankle lock weights in court;
9. error in admission of items of evidence;
10. improper communication with the jury by the prosecuting attorney;
11. denial of a mistrial motion based on a discovery mistake by the State;
12. presence of armed guards in the courtroom and on the witness stand;
13. denial of self-representation to Averhart and Hutson;
14. communication between the trial judge and the jury;
15. inconsistency in the evidence regarding wounds on the body and the bullet recovered in the autopsy;
16. surprise to defendant Averhart based on the theory of the State's case;
17. error in finding that the killing occurred during the commission of a robbery;
18. error in the admission of Bank camera photographs;
19. sufficiency of the evidence;
20. use of a prior conviction for murder as an aggravating circumstance in regard to Averhart;
21. unconstitutionality of the death penalty statute;
22. error in instructing the jury as to the death penalty procedure; and
23. lack of death penalty review procedure in Indiana's death penalty statutes.

The facts tend to show that on August 11, 1981, at about noon, the Gary National Bank at 3600 Broadway, Gary, Indiana, was robbed by three men. Gary Police Officer Lieutenant George Yaros was killed by gunfire in a shootout with the robbers as they attempted their escape.

Witness William E. Pendleton was in the Bank parking lot by his automobile when he saw three masked people, one of them quite well dressed, run toward the Bank and enter it. When Pendleton observed this, he did not enter the Bank. Elton Bourseir, a security guard at the Bank, stated that an armed man came up behind him, took his gun, and pushed him into the

lobby, telling him to lie on the floor. Bourseir did so. The man was about 6'3", a very dark complexioned black man with an "afro" hairdo, sunglasses, a light blue coat, and black gloves. The firearm taken from Bourseir was a .38 Colt nickle-plated, pearl handled, two-inch revolver. Employees of the Bank testified that the three men came into the branch with weapons drawn, had everyone lie down on the floor, and took money belonging to the Bank. Louis Lepp, the Assistant Manager of the Bank branch, testified to these events. As he lay down, he reached for an alarm button and set off the alarm. This button also activated a Diebold security camera. The alarm button activated an alarm in the office of the alarm company and notified the police department. Mavis Reeves testified she was sitting at her typewriter where she could see the back door. The back door opened and a man with a gun ran in and jumped over the counter, holding the gun to a guard's head. Two other men with guns and masks ran in. The first man was pushing the guard to get him out into the lobby. This man had a large gun in his hands and was wearing a blue suit. One of the other two men wore a shirt and vest and the third wore a plaid shirt. When it was apparent the police were on the scene, the three men started to leave the Bank. Mrs. Reeves saw them standing between the two sets of doors at the back of the Bank, shooting out. The man in the blue suit still had the long gun. Witnesses on the outside, including Pendleton, saw Officer Yaros pull up, block the exit lane of the Bank parking lot in a marked police car, and step out in an attempt to apprehend the robbers. He was in full police uniform. All three of the perpetrators opened fire on him and he fell to the ground. He was speaking into his walkie-talkie as he fell and other police officers testified they received a dispatch from him that indicated there was a robbery in progress and he needed help. The three robbers then ran past the squad car to get to their own vehicle. Two of them, the one in the sleeveless vest and the one in the plaid shirt, entered the car. The one in the blue suit went over to the police officer and kicked his pistol away from him. This individual then held his hand gun close to the police officer and fired another shot into his body. All three of them then left hurriedly in a light blue sedan type automobile. Officer Walter Jagilea was on the scene in a marked vehicle and saw the shooting of Yaros. He advised Officer Pastoret as to the identity of the two-tone blue four-door Ford in which the perpetrators were making their escape and Pastoret closely pursued them. Jagilea attempted to give aid to Yaros. Corporal Charles Oliver, of the Patrol Division of the Gary Police Department, was close behind Pastoret in pursuing the blue Ford. The subjects in the blue Ford leaned out of the side windows of the automobile, and shot back at the police officers while the pursuit took place. The vehicles reached speeds of 80 to 100 m.p.h. while going through the streets of Gary. The blue car finally struck a tree and was forced to stop. One of the occupants jumped out and ran south down 25th Street. Pastoret continued to pursue the automobile and finally apprehended defendants North and Hutson. Oliver pursued the man on foot and saw that this person was wearing a dark blue shirt, a light blue jacket, and light blue sports trousers. Oliver saw the man throw a wig to the ground while running down the alley and later recovered this wig. He saw the suspect run to the back of the second house on the left, which had a six foot fence at the rear, and saw the suspect jump over it. Oliver went through a gate and then realized too much time had passed to pursue the suspect any further on foot, so he jumped back into his automobile and circled to 26th Avenue. The suspect was no longer in sight but there was a street crew working and Oliver asked them if they had seen the man. One of the workers came up and gave Oliver directions, stating that the man he wanted had gone east to Buchanan Street. This witness was James Charles McGrew, who stated he was working for Vulcan Basement Waterproofing at Lincoln Street around 26th Avenue when he heard gunshots. McGrew looked up twice. The

second time he saw a black man in a blue jacket. The black man reached into the waist band of his trousers, removed a pistol and placed it in the bushes. After he walked four steps further and placed a bag into the bushes, he walked a few more steps and put his jacket into the bushes. McGrew watched the man cross the street very slowly and start walking towards the next corner. At this point, the police officer came by and McGrew advised him as to the direction in which this man had gone. Oliver then went in that direction and found defendant Averhart slowly walking north. His clothing closely matched that of the suspect he had been following. Oliver stopped him and handcuffed him. McGrew identified Averhart as being the same man he saw come by and place the items he had described into the bushes. Oliver recovered the light blue jacket in the bushes of the yard at 2532 Lincoln through which Averhart had fled. A six-shot Colt revolver was found wrapped inside the jacket. This was the gun taken from security guard Bourseir at the Bank. The clothing recovered from the bushes was identified by eye witnesses as that worn by Averhart during the robbery and murder. There also was a fragment of a bullet in the leg of Averhart's trousers. James Springfield was a security officer, working that day at the supermarket at 1421 West 25th Street in Gary, the scene of Averhart's course while being chased on foot by Oliver. He found a .44 magnum pistol behind the store. This he turned over to the police officer Elijah Cole. Witness Donald McDuffie testified that he had sold this weapon to Rufus Averhart. Ballistics tests indicated that this weapon had fired the shot that caused the death of Yaros. Lewis Lepp, the assistant general manager of the Bank, who had activated the Diebold bank camera, testified that he had checked the camera that morning and said it was loaded and ready to operate. Security officer Razumich removed the film and it was processed by Captain Phil Wieklinski. There were 309 frames showing activities of the robbery as described above. Mrs. Reeves viewed these photographs and was able to identify many of the scenes as those she observed. She particularly identified two through thirty-three, 144 to 146, 200 to 213, 265 to 285, and 292 to 296, as corresponding to, and truly and accurately depicting what she saw during the incident. All of the photographs were admitted into evidence. There were also handguns, a shotgun, and over $19,000.00 taken from the Bank, that were recovered from the blue Ford pursued by Pastoret and Oliver and from which Hutson and North were arrested. The money included several twenty-dollar bills which were especially packaged and held in reserve in the teller's cage as "bait money" with the serial numbers of these bills marked and kept on record by the Branch Manager and the security office.

## Issue (a)

Defendant North tendered a voluntary manslaughter instruction and asserts error in its refusal by the trial court.

■ The question of whether an instruction on a lesser offense should be given in a two-step inquiry. First, it is determined whether the lesser offense is included within the crime charged. If it is included, the determinative step is whether the evidence warrants instruction on the lesser and included offense. This decision generally rests on whether a serious evidentiary dispute exists with respect to the element which distinguishes the offenses. *Swafford v. State*, (1981) Ind., 421 N.E.2d 596; *Roddy v. State*, (1979) Ind.App., 394 N.E.2d 1098, *reh. denied.*

■ There is no serious evidentiary dispute here with respect to the elements distinguishing murder, felony murder, and voluntary manslaughter. There is no evidence suggesting sudden heat or a claim or showing by this defendant, or any of them, that such evidence is apparent. The facts show that Yaros was knowingly and intentionally killed and that the killing occurred in the commission of a robbery. There was thus no evidence to support the tendered manslaughter instruction and the trial court correctly refused it.

### Issue (b)

Appellant North further claims that his sixty-year sentence was manifestly unreasonable.

■ Absent a showing of manifest unreasonableness, this Court will not alter a sentence. *Williams v. State*, (1979) 271 Ind. 656, 395 N.E.2d 239; *Hanic v. State*, (1980) Ind.App., 406 N.E.2d 335. Where the sentence is within statutory limits and imposed after the trial court had given full consideration to the pre-sentence report and found that aggravating circumstances outweighed mitigating circumstances, this Court will not set it aside. *Jones v. State*, (1981) Ind., 422 N.E.2d 1197; *Hanic, supra*. Ind.Code § 35–4.1–4–3 (transferred to § 35–50–1A–3, Burns Repl.1979) requires the trial court to make a statement of aggravating circumstances in support of an enhanced offense or consecutive sentence. *Forrester v. State*, (1982) Ind., 440 N.E.2d 475; *Bundy v. State*, (1981) Ind., 427 N.E.2d 1077. North does not claim the trial court failed to make his findings and state his reasons in sufficient detail to justify giving him the aggravated twenty (20) years in addition to the presumptive forty (40) year sentence. The record shows the trial court did, in fact, give sufficient reasons and details to justify the sixty (60) year sentence pursuant to *Page v. State*, (1981) Ind., 424 N.E.2d 1021. Rather, North claims the evidence showed his "non-involvement" in the actual killing to the extent the trial judge was not justified in giving him the aggravated sentence. North's argument has no merit. The evidence showed all three robbers burst into the Gary National Bank obviously acting in concert. North acted along with the other two in carrying out his part of their joint enterprise by taking money while threatening deadly force against the employees and customers of the Bank. When the robbers met resistance by the police in attempting to exit the Bank, all three fired from the Bank vestibule. North, as well as the other two, took part in the firing under which Lieutenant Yaros fell. The only thing in which he did not participate was the final shot, attributed to co-defendant Averhart, which was described by some of the witnesses as the execution shot. Finally, the evidence showed that after the high speed running gun battle, North was apprehended just as he leveled a high powered pistol at another Gary police officer. The testimony of the officer who apprehended North and disarmed him, strongly implied that had he not been interrupted North would have killed this officer. Therefore, considering the character of the offense and the offender, the sentence imposed on North cannot be said to be manifestly unreasonable and we do not find it so.

### I

■ Appellant Averhart claims the trial court erred in refusing to grant his motion to dismiss the indictments based on mistakes made in his arrest and the filing of informations against him. The State initially charged these defendants by informations. It is apparently the policy of the prosecuting attorney of Lake County not to file counts asking for the death penalty without first submitting them to the Grand Jury for their consideration. The State subsequently did this and nine days after their arrest, indictments were returned by the Grand Jury followed by the withdrawal of the informations in question by the State. In his *pro se* brief, appellant Averhart claimed there was a failure to read him his Miranda rights, he was held incognito for nine days, there was a falsity of affidavits attached to the initial informations filed, there were formal defects in the informations, and there was a lack of probable cause. He claims he was held incommunicado during the period of nine days between the arrest and the return of indictments. These claims are without merit. Averhart admits in his *pro se* brief that during the nine day period, he, in fact, appeared before the trial court and was arraigned, orally moved for pre-trial discovery, moved for change of venue from the judge, and moved for a change of venue from the county. It is clear he did

appear in court at least once and was arraigned on the charges. There is no evidence other than Averhart's claim now that he was held incommunicado or that he was mistreated in any manner. The arrest of these defendants, as we already have noted above, came after their encounter at the Bank, a shoot-out which left Lieutenant Yaros dead, a high speed chase in which there was firing on the police officers, and their apprehension by force at which time they were in possession of the loot taken from the Bank. It can hardly be said Averhart was arrested without probable cause.

■ No issue is presented as to rights arising under *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 and its progeny with reference to the admissibility of a statement or admission by a defendant when obtained during custodial interrogation. No statement or admission was ever obtained from either of these defendants and therefore never offered by the State. Nor is there any allegation that any of the State's evidence was obtained as fruits of any such admission. Appellant raises this issue on a mistaken belief that a reading of *Miranda* rights is pre-requisite to continued detention, formal charging, and/or conviction. In fact, *Miranda* is totally irrelevant and inapplicable where no fruits of custodial interrogation are involved. Furthermore, defendant Averhart has not provided us with a record of his arraignment, the text of the initial informations, or any allegations of any of these pre-indictment detention issues. Without such record, this Court is unable to review the issues alleged if, in fact, they did exist at the trial level. Furthermore, these allegations are not raised in either Averhart's *pro se* motions or his counsel's motions to correct errors. If these issues did exist to any extent at trial, they are waived and not properly before this Court. *Jaske v. State,* (1978) 269 Ind. 196, 379 N.E.2d 451; *Moore v. State,* (1981) Ind.App., 426 N.E.2d 86.

## II

Averhart and North claim there was such a defect in the grand jury proceedings that reversible error was committed by the trial court in failing to dismiss the indictments.

■ Appellants do not claim there was any defect in the selection or makeup of the grand jury but complained only as to certain evidence that was presented to it. Defendant's motion to dismiss the indictments on the basis of defective grand jury proceedings was untimely filed and was therefore clearly subject to summary denial by the trial court. Arraignment had occurred more than five months before the motion was made and the trial court accordingly could properly deny the motion for that reason. *Goodner v. State,* (1978) 178 Ind.App. 312, 382 N.E.2d 968. The State properly points out that a motion charging a defect in the grand jury proceedings is one that, at the time, was governed by Ind.Code § 35-3.1-1-4(a)(3) (Burns Repl.1979) which was included in the old Plea in Abatement section. Under the provisions of that statute and pursuant to § 35-3.1-1-4(b) (Burns Repl.1979), it was untimely since it was filed after arraignment and the plea was entered. It was therefore subject to being summarily denied by the court. This statute has since been repealed and has been replaced by Ind.Code § 35-34-1-4(b) (Burns Supp. 1984), but the motion was also untimely filed pursuant to the new statute and barred because it was filed fewer than twenty days before the omnibus hearing date already set. In this case, the indictments were returned on August 20, 1981. Arraignment and pleas occurred on September 2, 1981. The grand jury minutes were filed on or about September 17, 1981. Defendant did not move to dismiss on the grounds of defective grand jury proceedings until February 12, 1982, just four days before the date set for the omnibus hearing. Even though the trial court noted that the motion was subject to summary denial because of its late filing, he deferred any ruling on the death penalty counts until after the presentation of the State of Indiana's case at trial. He later denied the motions. Although the trial court's ruling

was proper for the reasons we already have given, we will review the contentions raised by Defendant.

The prosecuting attorney of Lake County filed informations against all three defendants in this cause, charging them with felony murder and requesting the death penalty. He indicated it was his practice where he was seeking the death penalty to have a grand jury hear the matter and be given an opportunity to return indictments. He felt, even though he had the authority to charge the defendants and to seek the death penalty without the aid of the grand jury, it was advisable and desirable to have the community feeling demonstrated by the actions of the grand jury. He therefore presented the entire case to the grand jury. There is no claim that the grand jury was improperly constituted or any claim that the facts of this case were not properly presented to the grand jury by the witnesses and exhibits that were available and used at trial before the petit jury. In addition to these witnesses, however, the prosecuting attorney called several additional witnesses who spoke about the propriety of the death penalty being imposed in this case. These witnesses involved (1) fellow police officers Maton and Kowski, who spoke as to the character of Lieutenant Yaros as a person and as a police officer; (2) testimony of these two police officers as to the propriety of the death penalty in cases such as this; (3) testimony of newspaper reporter Ernest Hernandez and others relating to Averhart's prior convictions for manslaughter in the commission of an armed robbery and Hernandez's opinion as to the propriety of the death penalty in a case such as this; (4) a comment to the grand jury which the defendants cite as a misstatement of the shortness of the jail term Defendant might receive absent a death penalty count; and (5) impropriety of the prosecuting attorney in blocking inquiry by a grand juror about an interview between Hernandez and Averhart's mother.

■ It is the contention of the appellants that this evidence tended to unduly prejudice the grand jury to the extent that the indictments should have been dismissed by the trial court.

The position of the State is well taken that no issue is presented here which merits dismissal of the indictments. There is no showing that the grand jury was improperly constituted pursuant to statute or that there was any improper conduct of the grand jury. Averhart's citation to *Brown v. State*, (1982) Ind.App., 434 N.E.2d 144, *trans. denied*, does not support his position. In *Brown*, we first noted the issue was properly and timely raised and denied by the trial court. In *Brown*, it also was shown there was conduct which was contrary to the statute limiting who may be present besides the prosecuting attorney, jurors, and witnesses, during the time testimony was being offered to the grand jury. In violation of the provisions of the statute, a deputy sheriff was allowed to stay in the grand jury room with the prosecuting attorney and took a direct part in questioning witnesses and encouraging them to "more fully and honestly" testify before the grand jury. He gave the grand jurors background information during the witness' testimony and put pressure on witnesses to speak out. The Court of Appeals properly found that the indictments in *Brown* should have been dismissed because the procedure followed violated the minimal protection afforded by statute that an indictment will follow only "from impartial consideration in a neutral and detached atmosphere in the grand jury room." *Id.*, 434 N.E.2d at 146. The Court of Appeals found that the totality of circumstances in the proceedings influenced the course of proceedings in a manner adverse to Brown's substantial right to a detached and neutral atmosphere. Here, Appellants contest only the content of certain testimony and not the manner in which the evidence was obtained. They do not show that the entire proceedings before the grand jury were so pervaded with bias that there was a lack of a detached and neutral atmosphere within the grand jury. There is neither a showing or claim that anyone besides the prosecuting attorney participated in the proceedings, nor that witness-

es were oppressed in any manner. *State v. Bowman,* (1981) Ind., 423 N.E.2d 605. The only allegation is that certain evidence was irrelevant or prejudicial and led to a lack of impartiality on the part of the grand jury.

■ Even if true, this claim is not grounds for dismissal of an indictment. A claim of impartiality or bias of a grand jury is neither grounds for disqualification of a jury, grounds for a finding it is illegally constituted, nor grounds for dismissal. *Jones v. State,* (1979) 270 Ind. 285, 385 N.E.2d 426; *Stevens v. State,* (1976) 265 Ind. 396, 354 N.E.2d 727–730 *reh. granted,* (1976) 265 Ind. 396, 357 N.E.2d 245; *Jarver v. State,* (1976) 265 Ind. 525, 356 N.E.2d 215, *reh. denied.*

Averhart's claim that there was a due process violation based on citation to several federal cases also is without merit. The federal cases cited by Averhart concern the question of a deprivation of Fifth Amendment due process where there was evidence of prosecutorial misconduct before the grand jury. In *United States v. Cederquist,* 641 F.2d 1347 (9th Cir.1981), it was held that dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way. *See also, United States v. Thompson,* 576 F.2d 784–786 (9th Cir.1978). The court went on to say that it must be shown that the prosecutor's conduct significantly infringed upon the ability of the grand jury to exercise its independent judgment. *United States v. Chanen,* 549 F.2d 1306, 1310, 1311 (9th Cir.1977), *cert. denied* (1977) 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83; *United States v. Samango,* 607 F.2d 877 (9th Cir.1979); *United States v. Wells,* 163 F. 313 (D.Idaho 1908). In none of those cases was there found to be justification for dismissal of the indictments even though the courts found there was misconduct of the federal district attorney in his handling witnesses and testimony before the grand jury. These judgments were held on the basis that there was otherwise competent evidence before the grand jury sufficient to support the indictment, and that the con-

duct of the prosecutor before the grand jury did not create a defect of constitutional or legal proportions. *United States v. Bruzgo,* 373 F.2d 383, (3rd Cir.1967); *Laughlin v. United States,* 385 F.2d 287 (D.C.Cir.1967), *cert. denied* (1968) 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103.

Federal courts have indicated that where prosecutorial misconduct is of such an overreaching nature that the independent judgment of the grand jury has been affected dismissal of the indictment would be a proper sanction to deter such conduct.

■ Appellants have failed to show a violation of their due process rights by attacking prosecutorial conduct during the grand jury proceedings. The evidence was presented to the grand jury in a direct and even-handed manner by witnesses and exhibits which demonstrated the crimes committed. We cannot help but note the presentation of these facts produced sufficient flagrant conduct to justify the grand jury in returning the indictments it did. The presentation before the grand jury of the additional witnesses who spoke about the propriety of the death penalty, in which some of them referred to the desirability of "exterminating" these defendants, was unnecessary to the proper presentation of the case and might even be said to be ill advised. However, it cannot be said that there was such a flagrant imposition of the grand jurors' will or independent judgment that pervaded the hearing such that there was a violation of due process. This is certainly true since the function of the grand jury is only to find grounds to return indictments, which it did here. Further, the prosecuting attorney had authority and did, in fact, file informations in the exact form that the grand jury returned. The prosecuting attorney then withdrew his informations and filed the indictments in the cause. Finally, none of this unnecessary testimony was ever presented to the petit jury who heard the case. For all of these reasons we see no reversible error presented in this issue.

## III

All three of the appellants moved for severance of their trials from each other. These motions were denied and they were tried jointly. Pursuant to Ind.Code § 35–3.1–1–11(b) (Burns Repl. 1979) the decision as to whether a separate trial should be granted is within the trial judge's discretion, and an allegation of error in the overruling of such a motion can be supported only by a showing of an abuse of that discretion. *Jones v. State,* (1981) Ind., 421 N.E.2d 643; *Scott v. State,* (1981) Ind., 425 N.E.2d 637. The soundness of the trial court's discretion is measured by what actually transpired at trial rather than what was alleged in the motion, and the defendant bears the burden of showing that the denial of a separate trial subjected him to such serious prejudice that he was denied a fair trial. *Jones, supra; Chandler v. State,* (1981) Ind., 419 N.E.2d 142.

*Baysinger v. State,* (1982) Ind.App., 436 N.E.2d 96, *reh. denied,* held that even the mere fact that a co-defendant implicates another does not entitle the latter to a separate trial. In *Crenshaw v. State,* (1982) Ind., 439 N.E.2d 620, this Court held it was not error to refuse to sever trials when a co-defendant intended to take the stand and make statements that were damaging to the movant.

In the instant case no defendant took the stand nor did any defendant make an out-of-court statement. Not one of the defendants implicated the other and there was no pattern of co-defendants questioning that tended or attempted to single out any one of them as the trigger man. Though the facts show by the testimony of eye witnesses, that Averhart was clearly the one that shot the fatal blow, this was not emphasized or brought out by Hutson and North in their presentation of evidence or cross-examination of State's witnesses. All of the testimony emphasized that the three men worked in concert even including the firing upon Yaros as they left the Bank. The State claims each bore responsibility for their actions, as well as those of their accomplices, and obviously tried the case on the theory of vicarious liability, claiming all three shared equally in guilt for the fatal shot. *Harris v. State,* (1981) Ind., 425 N.E.2d 154. Since none of the defendants took the stand or made an out-of-court statement or attempted to frame their defense to single out any one of them as the "trigger man," no grounds were presented to the trial court concerning Ind. Code § 35–3.1–1–11(b) (Burns Repl.1979) that required the court to give them separate trials. Furthermore, since there is no showing that any one of them was prejudiced by such development in the trial, they failed to show an abuse of discretion in the trial court on this issue.

Averhart's claim that the character of the trial was to single him out as the "trigger man," particularly since he had a previous conviction for manslaughter which had since been set aside, is without merit. In the first place, the jury was never notified in any manner that Averhart had previously been convicted of manslaughter. Furthermore, as we already have indicated, the fact that Averhart was the one that delivered the fatal shot was not revealed through the efforts of Hutson and North in the strategy of their defenses, therefore no prejudice occasioned Averhart by reason of his being tried jointly with them. Any facts indicating such conduct on his part came from evidence independent of their positions. It is true in the punishment phase of the trial North and Hutson argue that they should have escaped the death penalty because neither of them fired the fatal shot. We agree with the State, however, that this does not amount to what Averhart calls the consistent, repetitive pattern of emphasis being placed on Averhart as the "trigger man" who should receive the death penalty. Nowhere in the record is there evidence of Hutson or North advocating or implying that Averhart should be executed and Averhart furnishes us no such facts. Co-defendants here took much less inimical positions toward each other than was present in *Baysinger, supra,* and *Crenshaw, su-*

*pra.* The evidence tended to show all three defendants acted in concert and their defense was united in meeting this evidence. The outcome of the trial in finding all three defendants guilty of murder and the imposition of the death penalty on Averhart cannot be assigned to the fact that they were jointly tried. There was therefore no error on this issue.

### IV

 All three appellants also claim they were prejudiced by being represented by separate counsel all from the same Lake County Public Defender's office. Although this issue is raised by the defendants somewhat in conjunction with the immediately previous issue of severance, the contentions made here conflict with contentions on the former issue. Averhart, in particular, claims there were times when Hutson and North in their cross-examination of State's witnesses attempted to reduce the significance of their participation thereby directing the blame to Averhart. He now attempts to show that he was not given full and proper representation by his counsel because there was a conflict of interest that existed between the attorneys from the same public defender's office. The conflict that would be pertinent here would be one that would render his attorney incapable of fully representing him to his detriment. By showing that each counsel fully and completely represented his own client does not show that. In fact none of the defendants present a single instance that demonstrates such a conflict of interest existed that the adequacy of his counsel's representation was affected. Any defendant asserting conflict of interest on the part of his attorney due to the attorney's duty to a co-defendant must show that the conflict of interest was actual and not just theoretical, and that it actually affected his lawyer's performance. *Cuyler v. Sullivan*, (1980) 446 U.S. 335, 100 S.Ct. 1078, 64 L.Ed.2d 333. *Cuyler* further provides a trial court need not initiate an inquiry into joint representation unless it knows or reasonably should know that a particular conflict exists. It is the duty of a defendant to show that the joint representation resulted in actual prejudice. *Dean v. State*, (1982) Ind., 433 N.E.2d 1172; *Ross v. State*, (1978) 268 Ind. 608, 377 N.E.2d 634. Averhart cites us *Ross v. Heyne*, 638 F.2d 979, (7th Cir.1980). However, *Ross* does not aid him in his contention because in *Ross*, a co-defendant was represented by the law partner of another defendant's attorney. During the trial, the co-defendant was a key witness against the defendant but cross-examination failed to disclose that he was testifying pursuant to a leniency agreement or that he had a prior criminal conviction. The Seventh Circuit found that there was ineffective assistance of counsel because the defendant's attorney was laboring under an actual conflict of interest. It appeared that the defendant's attorney had learned much of the information about the witness from his law partner and that such information was protected by the attorney-client privilege and thus was not used. There was no such showing here. Defendant does not advance a single factual contention concerning any failing of his attorney, Mr. Schneider, relative to his coming from the same public defender's office as the other defense attorneys. We therefore see no error on this issue. *Cuyler, supra; Dean, supra; Richardson v. State*, (1982) Ind., 439 N.E.2d 610, 611.

### V

Appellant Averhart raises several allegations of error regarding the *voir dire* of the petit jury and presentation of evidence before it. We will consider each contention under this general heading separately.

 Appellants Averhart and Hutson claimed there was error in permitting *voir dire* of the petit jury to include "death qualifying" questions that would be impermissible pursuant to *Witherspoon v. Illinois*, (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776; and *Adams v. Texas*, (1980) 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed. 581. *Witherspoon* provided a court may excuse for cause potential jurors who actually

state in advance that they would not even consider returning a verdict of death under any circumstances and regardless of the evidence presented to them. Most of the prospective jurors excused for cause in *Witherspoon* had only expressed some degree of disagreement with or scruples against the death penalty. *Witherspoon* held that such general disagreement on the death penalty without inquiry to determine that the jurors could or could not vote to impose it in a proper case was impermissible. In this case, only six potential jurors were excused for cause on this basis. Every one of them had unequivocally stated that they could never recommend the death penalty no matter what the facts were. Notably there were many potential jurors who had reservations or doubts about the death penalty but who said that these reservations would not necessarily compel a vote against recommending it. These jurors were not excused for cause. *Monserrate v. State*, (1971) 256 Ind. 623, 271 N.E.2d 420; *Lamar v. State*, (1977) 266 Ind. 689, 366 N.E.2d 652, *reh. denied*. In *Adams, supra*, the United States Supreme Court found that Texas' procedure went further than the permissible exclusion. People were excluded for cause when it did not "appear in the record before us that these individuals were so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its constitutionally permissible death penalty scheme." *Adams*, 448 U.S. at 51, 100 S.Ct. at 2521. But the Supreme Court reiterated that the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths. In *Hoskins v. State*, (1982) Ind., 441 N.E.2d 419, this Court found the trial court acted properly in excusing for cause prospective jurors who stated explicitly in response to court propounded *voir dire* questions that they would not recommend the death penalty under any circumstances. No reversible error is presented on this issue.

■ Appellant Averhart claims the jury was tainted by pretrial publicity in violation of a court imposed "gag order." Averhart claims the court had issued a "gag order" governing all parties against the release of information to the press. There is no evidence of this "gag order" in the record and, in fact, no evidence of its being issued at all except defendant Averhart's allegation to that effect. The State denied it made any press release and the only showing by Defendant of any media publication was a photograph from the Bank camera shown on one of the TV broadcasting stations in the Allen County area. The State pointed out that this photograph was in the hands of the press soon after the crime and was not released to the press by the State. Furthermore, the showing was that this picture was broadcast one time and by one station. Only one prospective juror had seen or heard any publicity about this case and that juror was excluded for other reasons. None of the remaining members of the jury indicated they had seen or heard any publicity involving this case or these defendants. The only publicity Averhart shows is from the Lake County area by the *Gary Post-Tribune*. This came about by the fact that, a few days before Averhart's arrest, one of the reporters for the *Post-Tribune* had written an article in which he cited Averhart as being a model example of rehabilitation. Averhart had been convicted of manslaughter in the killing of an elderly man during a burglary some years before. He served a term of nine years and apparently that conviction had been set aside since that time. This article cited Averhart as an example of one who had been rehabilitated thereby demonstrating the impropriety of the death penalty. Very shortly thereafter, Averhart was arrested for this offense. Upon this showing to the trial judge in Lake County, a change of venue from the county was granted and the cause was venued to Allen County which is across the State from Lake County, a distance of more than one-hundred miles. None of the media sources of the Lake County area, including the Chicago TV stations and newspapers, circulate in the Allen county area and jurors were totally unaware of any such publicity. There

is, therefore, a total lack of showing by Averhart that the jury was in any way tainted by pretrial or in-trial publicity or that there was any prejudice in the community that would prevent the defendant from receiving a fair trial by jurors in that community. There is therefore no merit to this contention.

■ All three appellants moved to have each prospective juror questioned individually and kept separated or sequestered from each other during *voir dire*. This motion was denied. We have held there is no right accorded to a defendant to have each juror questioned separately outside of the presence of the other jurors. In fact, our general procedure in the conduct of trials is to the contrary and a trial court has broad discretion in regulating the form and substance of *voir dire*. There is no showing the trial court abused its discretion by denying these motions. *Ward v. State,* (1982) Ind., 439 N.E.2d 156, *reh. denied; Fielden v. State,* (1982) Ind., 437 N.E.2d 986; *McCormick v. State,* (1982) Ind., 437 N.E.2d 993; *Hopkins v. State,* (1981) Ind., 429 N.E.2d 631.

■ Appellants further claim an oral motion was timely made to have the jury sequestered during the trial and that the motion was improperly denied. Appellants admit that nowhere in the record is there any indication of a motion, written or oral, asking for sequestration of the jury. The record does show that the jurors were permitted to go home at the end of the first day of *voir dire,* after the jury had been chosen, and again at lunch hour after testimony began. Each time the jury separated during the trial the judge gave them a detailed admonition. No party objected to any of these separations throughout the course of the trial. Failure to make a record of the motion for sequestration and its denial precludes appellate review of the issue. *Hedges v. State,* (1982) Ind., 443 N.E.2d 62. Since this was a capital case, jury sequestration would have been mandatory if such a motion had been made. *Lowery v. State,* (1982) Ind., 434 N.E.2d 868, *reh. denied.* An error alleged but not dis-

closed by the record is not a proper subject for review. *Hedges, supra; Banks v. State,* (1980) 273 Ind. 99, 402 N.E.2d 1213; *Pulliam v. State,* (1976) 264 Ind. 381, 345 N.E.2d 229, *reh. denied.* In the record before us there is what seems to be a complete record of *voir dire.* Averhart claims there are matters which occurred both at *voir dire* and during trial which are not on the record. Ind.R.App.P. 7.2(C) provides a clear procedure for the clarification of an unclear or incorrect record. Neither Averhart nor any of his co-defendants sought to make a record of any of the matters he now claims are missing regarding a motion for sequestration of the jury. Nowhere in the trial record is there any appearance of an objection to proceeding without sequestration. Averhart refers us to his motion to perfect the trial record which sought to have certain alleged omissions or errors in the trial record perfected or corrected. None of the allegations in this motion, however, concerned any of the matters raised in this appeal, more particularly the one involving sequestration of the jury. The only issues raised in his motion to perfect and correct the record were as follows: so called racist and prejudicial gestures by prosecutors and co-defendants' counsel; death threats made by persons not party to the proceedings; that Averhart did not know the faces of his adverse witnesses before trial; that prosecutors and co-defendants' counsel allegedly made hand gestures to single out Averhart for identification; and undisclosed omissions caused by short circuits in the microphone during trial. No evidence was ever presented on any of these issues nor any attempt made to have opposing counsel and the court settle the record with regard to these issues. No attempt was ever made to settle or correct the record with regard to an alleged oral motion to sequester the jury. We are therefore unable to address this issue on the merits. *Dunn v. State,* (1982) Ind., 439 N.E.2d 165; *Alleyn v. State,* (1981) Ind., 427 N.E.2d 1095; *Morse v. State,* (1980) 274 Ind. 652, 413 N.E.2d 885, *reh. denied.*

Appellant Averhart raised several issues regarding the racial composition of the jury. All three of these defendants were black. Averhart moved that the State be enjoined from systematically excluding black jurors by use of peremptory challenges. Apparently the State had excluded only one black prospective jury panelist and gave its reason for doing so which was not based on race. The trial judge held a hearing on Defendant's motion to enjoin the State from using peremptory challenges to systematically exclude blacks from the jury, and at that hearing the court asked Averhart to make a showing that such an event was likely to occur. Averhart was unable to make such a showing, but only expressed that he had reason to believe the State would do so without giving any reason. The court denied the motion. We see no error in such a ruling. In the first place, Averhart has not substantiated even an inference that the State was systematically excluding blacks by use of peremptory challenges. Furthermore, the State is not required to give reasons for exercise of peremptory challenges. A peremptory challenge is what the name implies. No party is required to explain its reasons for the exercise of such a challenge. *Hoskins v. State*, (1982) Ind., 441 N.E.2d 419. There is a presumption that the prosecution uses its peremptory challenges to obtain a fair and impartial jury and that presumption is not overcome by allegations that in a particular case all members of a group or race were removed from the jury or that they were removed because they were of a race. *Hoskins, supra; Swain v. Alabama*, (1965) 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759.

Averhart further complains because of the exclusion of one black prospective juror for cause. This prospective juror, however, was excluded for cause on motion of one of the co-defendants. That prospective juror on *voir dire* stated that although in the penalty phase of the trial he would consider any aggravating circumstances, he would not consider mitigating circumstances. The Indiana death penalty statute, § 35–50–2–9 (Burns Repl.1979) requires a jury assembled on the issue of capital punishment to consider any mitigating circumstances. Such consideration is required under *Eddings v. Oklahoma*, (1982) 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1; *Enmund v. Florida*, (1982) 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140; *Gregg v. Georgia*, (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, *reh. denied;* and *Jurek v. Texas*, (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, *reh. denied.* All of these cases require individualized consideration of all factors involving mitigation and defendant's character. It is difficult to see how Averhart was prejudiced by the exclusion of this prospective juror. He does not demonstrate that he was prejudiced in any manner by such exclusion. *Pettit v. State*, (1979) 272 Ind. 143, 396 N.E.2d 126.

In his argument Averhart seems to imply that the makeup of the jury panel was such that it excluded blacks. He makes no showing, however, that this was true. Neither he nor any of his co-defendants introduced any evidence of the source of the list from which the panel was drawn, identified any distinctive group in the community alleged to have been excluded, or made a showing of the use of the list as a deliberate attempt to exclude certain groups, particularly black people, from jury selection. The burden of demonstrating purposeful discrimination is, of course, on the defendant. Jurors need not be mathematically proportioned to the character of the community and there is no requirement that any particular class be represented on every jury. To show reversible error it must be shown that a demonstrated underrepresentation is due to the systematic exclusion of the group in the jury selection process. Averhart did not carry his burden in this regard. *Tawney v. State*, (1982) Ind., 439 N.E.2d 582; *Bryan v. State*, (1982) Ind., 438 N.E.2d 709; *reh. denied; Taylor v. Louisiana*, (1975) 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690.

VI

Averhart complains that during *voir dire*, arguments to the jury, and in-

structions to the jury, the jury was told that their verdict was advisory or a recommendation. Averhart now complains that the word recommendation was overused, which overuse he says lessens the jurors' appreciation of the significance of their role in the overall scheme. The record shows that neither Averhart nor his co-defendants at any time objected to the use of this term during trial. Since it was a proper statement of the law and no objection was ever offered against its use, we see no error on this issue. *McCraney, supra.*

### VII

During *voir dire* the prosecuting attorney made reference to evidence the jury might receive as to deceased's war record and his family. The State points out that no objection was made to any of these questions and that failure to complain of alleged error at trial in a timely fashion results in waiver of the issue. *McCraney v. State,* (1981) Ind., 425 N.E.2d 151. The State points out that evidence in regard to deceased's family was in response to and in rebuttal to Defendant's references to their families and was a permissible response. Furthermore, the jury was advised that counsel's comments in argument in *voir dire* were not to be taken as evidence by them. Related to this claim is the contention by Averhart that the trial court erred in admitting into evidence a photograph, sponsored by deceased's widow, which pictured the deceased in civilian clothes and accompanied by his young granddaughter. The purpose of the widow's testimony was to show that Yaros left his home shortly before this incident and that he was alive and well. Furthermore, he was in uniform and wearing his badge. She testified that when he left their home that day he appeared exactly as the photograph depicts him except that he wore his uniform and badge and the photograph shows him in civilian clothing. The only objection made at the time the photograph was offered into evidence was that there was improper authentication and no relevancy to the crime. Averhart now claims that the photograph was improperly admitted in that it

was unduly prejudicial because it showed the victim in a family setting with a young granddaughter. Wide latitude is vested in the trial court to determine the probative value of evidence as against its prejudicial impact. *Chittenden v. State,* (1982) Ind., 436 N.E.2d 86. The trial court clearly did not abuse its discretion by admitting the photograph against objections of improper authentication and lack of relevancy. It was adequately identified by the witness and relevant to support the witness' testimony as to the appearance of the victim a short time before his death at the hands of these defendants. Since Averhart did not object to the prejudicial character of the photograph at the time of its admission he does not have available to him such objection here.

Averhart further claims there was error in the introduction of autopsy photographs which he claims were impermissibly gruesome and says that their prejudicial effect was enhanced by comparison with the "happy" photograph of the living Yaros. We agree with the contention of the State that if all of the photographs are properly admitted, then any such comparison is merely incidental to their proper admission and does not indicate error. The autopsy photographs show the body from the hip to the neck and demonstrate the gunshot wounds on the body of Yaros. They do not depict autopsy incisions, internal organs, or surgical instruments. Markings on the photograph showed the path of bullets that indicate entrance and exit injuries. Although such photographs are by their very nature gruesome to view, it cannot be said that the court abused its discretion in determining that the probative value of these photographs outweighed their inherent prejudicial effect on the passions of the jury. *Chittenden, supra.* We therefore find no error in regard to the admission of any of these photographs.

### VIII

Appellants Averhart and North claim error was committed by requiring

them to wear ankle-lock weights during the trial. The only reference to this appears on the first day of trial where out of the presence of the jury, Averhart's counsel mentioned to the trial judge that "each of the defendants is wearing ankle braces or leg braces and I'm wondering is this the policy in Allen County?" The court answered, "Yes, that's not unusual." Mr. Schneider then asked the purpose of it, and the court stated it was to prevent escape. Mr. Schneider then said, "All right." No other reference or objection was made through the entire trial. Appellant now claims fundamental reversible error occurred and cites us to cases discussing prisoners who are shackled in court or wearing jail clothing. There is no contention or showing here that any of the defendants appeared in jail clothing or that they were in any restraints or shackles such as handcuffs, irons, etc. Ankle lock weights are weighted objects attached to the ankles of the defendants. They are not joined together and do not generally interfere with the physical movement of the leg. Their purpose is to slow down a person so that he is not able to run because of the weight applied to each leg. They are so designed that they can be completely covered and concealed by the lower part of the trouser leg and the evidence indicates that they were so concealed in this case. Neither the record nor these defendants indicate the jury was ever aware of the presence of the ankle lock weights on the defendants. We therefore see nothing prejudicial to these defendants that merits review. *Smith v. State,* (1981) Ind., 422 N.E.2d 1179–1182.

### IX

 Appellant Averhart claims there were certain errors of the court in its rulings on admissibility of evidence. The rule in determining evidentiary questions on appellate review is that since the trial court has an inherent discretionary power on questions of admission of evidence, its decisions are reviewed only for abuse of discretion. *Emory v. State,* (1981) Ind., 420 N.E.2d 883. Many of these claims can be

denominated only as frivolous as Averhart, either through his counsel or *pro se,* makes only general references to the impropriety of admission of certain items but cites no authority to support his position. We will attempt to dispose of these claims by individually considering the items.

 Averhart moved to suppress the items of clothing, that were found in the bushes where he hid them during his flight from the police officers, based on his claim that there was no probable cause for his arrest. He claimed that after the robbery the police rounded up every black man they could find in the area, in an attempt to find the perpetrators, and that he was one of those caught in this general search. As we already have demonstrated by setting out the facts above, there is no merit whatever to this contention as Averhart, North, and Hutson were pursued in a chase through the streets of Gary with shots being fired at the police during the pursuit. Hutson and North were apprehended in the automobile with the items taken from the Bank and Averhart was apprehended a short distance from the vehicle as he attempted to run across several yards in the area. Officer Oliver followed Averhart from the automobile and chased him across several yards. He lost sight of him for a very short time. During this time witness McGrew observed Averhart hide clothing and a gun in the bushes, then walk quietly down the nearest street in an attempt to appear casual and as if not in flight. When Oliver did take Averhart into custody, he therefore had ample probable cause for the arrest of Averhart because he had knowledge of facts and circumstances which would warrant a man of reasonable caution to believe the defendant had committed the criminal act in question. *Fyock v. State,* (1982) Ind., 436 N.E.2d 1089; *Battle v. State,* (1981) Ind., 415 N.E.2d 39; *Taylor v. State,* (1980) 273 Ind. 558, 406 N.E.2d 247; *Benton v. State,* (1980) 273 Ind. 34, 401 N.E.2d 697. Averhart's claim seems to be that it was improper to admit this evidence over a pending motion to suppress when Defendant objected to its admission be-

cause the motion was pending. The State points out, however, that the ruling in this case was the ruling on the pending motion to suppress. The court explicitly made an entry that the motion to suppress was denied and that the evidence was admitted. Under the facts and circumstances of the apprehension of Averhart here, it was proper to admit these items into evidence.

■ Averhart claims the testimony of two witnesses was improper because of impermissibly suggestive identification. This claim is based on the fact that defendants were seen by many of the witnesses being led into the court room during the trial. He therefore claimed witnesses McGrew and McDuffie had seen him being led into court and subsequently testified as to his identification. The evidence showed, however, that both of these witnesses had identified this defendant long before the time they saw them in court and therefore had sufficient independent basis for identification that was not tainted in any way by their observing him in the hallways of the court building prior to their testimony. *White v. State,* (1983) Ind., 455 N.E.2d 329; *Kusley v. State,* (1982) Ind., 432 N.E.2d 1337; *Dooley v. State,* (1981) Ind., 428 N.E.2d 1.

McGrew observed Averhart fleeing from the officer and stashing his clothing in bushes very close to where McGrew was working. He identified Averhart in the custody of Officer Oliver a few moments later. McGrew had observed Averhart for some period of time and in broad daylight. McDuffie was the man who had sold the .44 Magnum to Averhart and was able to identify him from that transaction. He too had identified Averhart long before the time he saw him being escorted down the corridors of the courthouse.

■ Mrs. Hoffman, who lived very near to the Bank, did not identify any of the defendants. She described only actions of and clothing worn by the three men. Mrs. Hoffman stated she did see photographs of the robbery after she discussed what she saw with the police and her memory "fell into place," and she was able to describe more clearly the clothing worn by the men and the number of men she saw. There was neither an objection to the questions and answers of Mrs. Hoffman nor any motion to strike the answers once she had viewed the photographs and testified regarding them. Defendant moved for a mistrial on the basis of prosecutorial misconduct in showing the photographs to Mrs. Hoffman during her testimony. The court properly denied this motion. Defendant could not show that he was placed in a position of grave peril to which he should not have been subjected by this procedure. Furthermore, he did not move to strike the testimony or ask for an admonition to cure the damage, if any, occasioned by the procedure. There is, therefore, no error in this issue. *Ramos v. State,* (1982) Ind., 433 N.E.2d 757 *reh. denied; Gambill v. State,* (1982) Ind., 436 N.E.2d 301; *Hicks v. State,* (1979) 272 Ind. 350, 397 N.E.2d 973.

■ Averhart also claims cross-examination by co-defendants of Mavis Reeves and David Reba tended to unfairly focus the jury's attention on Averhart's actions inside the Bank and put more blame on him than the other two. There is no merit whatsoever to this contention. Both Reeves and Reba testified only as to what they observed during the robbery and what they saw the three robbers doing. Many others also testified as to the actions of the robbers in the Bank and as to the clothing each of them wore. There was no objection to any of this testimony. All of this evidence described a joint endeavor by the three robbers in carrying out a coordinated plan of robbery, and the testimony of Reeves and Reba was cumulative. Averhart gives no grounds whatever on which to find that any of this testimony was improper. *Hazzard v. State,* (1980) 274 Ind. 679, 413 N.E.2d 895; *Sutton v. State,* (1981) Ind.App., 422 N.E.2d 430. Averhart points to no error in the admission of any of these items of evidence that warrants reversal.

### X

■ Averhart claims there was improper communication between the prosecutor

and the jury while the former was handing photographs to the first juror. The record does not show any communication between the prosecutor and any members of the jury. The record shows that the judge evidently heard someone speak while the jury began to view a stack of over three-hundred photographs and the judge inquired as to what was said. A juror said he had asked if he should hold all the pictures or pass them on as he got them. The record shows this was all that was said during this alleged communication. There is nothing in the record to show that the prosecutor said anything or responded in any manner. The court then directed the bailiff to take over distributing photographs to the jury and instructed the jury as to how he was going to do it. Averhart again moved for mistrial and again did not request a less drastic curative action by the judge. It is difficult to see how Averhart was placed in any peril by this incident. First he shows no statement made by the prosecutor and the record seems to indicate there was none. Second, the remark by the juror had only to do with the logistics of passing exhibits. The trial judge removed any problem by directing the bailiff to pass the large number of exhibits and directed the procedure he was to use. There is, therefore, no merit to this contention of error. *Ramos, supra; Gambill, supra; Pettit v. State,* (1979) 272 Ind. 143, 396 N.E.2d 126.

## XI

■ Averhart claims the trial court erred by refusing a mistrial motion as the result of a discovery mistake by the State. The State attempted to use a "Fedorchak Report" and some fingerprint index cards. The State failed to provide this report in discovery. It is not questioned that this was an oversight by the State and there is no inference that they purposely failed to disclose this material to the defendants. At any rate, the trial court did not permit this evidence to be used. The trial court further ruled that neither the defense was harmed by the inadvertent non-disclosure nor could Defendants be harmed by the exclusion of the items from evidence since the evidence was not exculpatory. The Fedorchak Report and index cards would have shown that no fingerprints of Defendants were found at the scene of the crime. Many witnesses had testified that all defendants wore gloves during the perpetration of this robbery and, in fact, gloves were among the items recovered from the bushes where Averhart had put them when he was fleeing Officer Oliver. It would therefore be expected that no prints would be recovered and of little probative value that none were found. If evidence that should have been discovered to the other party is revealed for the first time at trial, generally that party, here the defendants, have two remedies, (1) to move for a continuance, or (2) to move for exclusion of the evidence. *Reid v. State,* (1978) 267 Ind. 555, 372 N.E.2d 1149. Exclusion of such evidence is usually invoked only when the State has blatantly and deliberately refused to comply with the court's discovery order. *Johnson v. State,* (1979) 179 Ind. App. 28, 384 N.E.2d 1035. The usual remedy is to allow the defense a continuance in order to examine and meet the new evidence. *Sparks v. State,* (1979) 271 Ind. 419, 393 N.E.2d 151. Failure to seek a continuance waives any error resulting from any noncompliance with the discovery order. *Upshaw v. State,* (1976) 170 Ind. App. 206, 352 N.E.2d 102.

■ Here, the State attempted to admit the evidence and the trial court refused its admission. These items certainly do not represent surprise testimony as to any substantial matter. Defendants did not ask for a continuance to examine further the contents of the items offered. Further, if they felt the items were of some value to their cause or defense, they could have agreed to have them admitted or offered them themselves. Averhart cannot show here that he was prejudiced as to any of his substantial rights. The trial court has wide discretion in remedying any transgressions of the discovery order that occurs. Sanctions are discretionary, not mandatory. The defendant has not shown here

any intent on the part of the State or any prejudice resulting from the non-discovery of this evidence. He has therefore failed to prove the trial court abused its discretion in denying his motion for a mistrial inasmuch as the evidence was clearly not exculpatory. *Carson v. State*, (1979) 271 Ind. 203, 391 N.E.2d 600; *Rowley v. State*, (1979) 271 Ind. 584, 394 N.E.2d 928. The court properly denied the motion for mistrial.

## XII

 Appellant claims there was reversible error in his trial because of the presence of armed guards in the courtroom, uniformed police officers testifying on the witness stand, and a display of force that prejudiced him and his co-defendants. We have only Averhart's contention that this was true. He does not cite us to any support in the record that the presence of armed police officers in and about the courtroom were any different than that generally present during a capital murder case. Neither does he cite us to any authority for his contentions. He has therefore waived the issue pursuant to Ind.R. App.P. 8.3. The record makes no reference whatever as to the nature and appearance or number of armed officers in the courtroom or as to their appearance on the witness stand. There is therefore nothing for us to review on this issue. *McCraney*, *supra.*

## XIII

Both Averhart and Hutson claim they were unduly restricted in their right to represent themselves during the trial.

 Very shortly before trial Averhart moved for a change of court appointed counsel. The trial court denied that motion. Because the request was so untimely the denial of that motion by the trial court was not improper. A trial court has discretion to refuse to allow an accused to replace counsel during or immediately before trial when such a substitution would require the court to grant continuance. *Nation v. State*, (1983) Ind., 445 N.E.2d 565

*reh. denied; Vacendak v. State*, (1982) Ind., 431 N.E.2d 100.

During the trial both Averhart and Hutson indicated they wished to address the jury personally and put questions to witnesses before the jury. Neither of them made any indication that they wished to proceed *pro se*. The Court denied permission to Averhart and Hutson to personally ask questions of the witnesses or address the jury, but directed them to discuss with their counsel what questions they believed should be put to the witnesses. Averhart and Hutson both claimed infringement of their rights to self-representation by the manner in which the court handled these situations.

 Since these requests asked leave of the court to perform self-representational acts while also enjoying assistance of court appointed counsel, they were actually requests to have hybrid representation. There is no constitutional right to such hybrid representation and a trial court may, in its discretion, deny a motion requesting creation of such a scheme. *Houze v. State*, (1982) Ind., 441 N.E.2d 1369; *Lock v. State*, (1980) 273 Ind. 315, 403 N.E.2d 1360; *Coonan v. State*, (1978) 269 Ind. 578, 382 N.E.2d 157, *cert. denied*, 440 U.S. 984, 94 S.Ct. 1798, 60 L.Ed.2d 246; *Bradberry v. State*, (1977) 266 Ind. 530, 364 N.E.2d 1183.

 Averhart asserts that the trial court, upon receiving this motion, had a duty to determine whether Defendant really wanted *pro se* representation and the court was therefore duty bound to make an investigation as to Averhart's true intentions when he made this request. *Faretta v. California*, (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 and subsequent Indiana cases do not require any such inquiry. Before such a right is deemed invoked, its assertion must be clear and unequivocal and must be timely made. Requests made the day of trial are, *per se*, untimely. *Dixon v. State*, (1982) Ind., 437 N.E.2d 1318. In this case, both Averhart and Hutson made the request during the trial and did

not clearly and unequivocally assert that they desired to proceed *pro se*. Their only request was to subsidize the efforts of their counsel by asking questions of witnesses and addressing the jury. The trial court denied them this right but requested they ask such questions through their counsel. This was not improper and therefore no error occurred.

## XIV

 After being advised that the jury had arrived at a verdict but before calling them into court, the following occurred:

"COURT: ... [B]efore we bring back the jury, the court wants to make note for the record a note that the jury received at 3:25 from the jury. 'The jury would like the following: 1) definitions of murder and felony murder; and 2) can the jury find any defendant guilty of felony murder without finding that same defendant guilty of murder or vice versa.' And the court indicated that I had instructed them completely and that the only thing that the court could do would be to re-read the instructions in their entirety. Is there any objection for purposes of the record to the court's response to that? I think it's the only response I could give them.

MR. LEWIS: None, your Honor.

COURT: All right, then are you ready for the jury, gentlemen? ..."

All three defendants now claim the trial court erred by communicating with the jury out of their presence. Where jurors request additional guidance from the court, the proper procedure is for the judge to notify the parties and give them an opportunity to be present in court before he communicates with the jury. In *Childers v. State*, (1980) Ind.App., 408 N.E.2d 1284, it was held not reversible error *per se* for the court to fail to have the defendant present when he makes his response to the jury's request. *Childers* held it could raise an inference of prejudice if the court did not do so, but this inference could be rebutted if it was shown that no harm was occasioned to the defendants. Where the trial judge merely responds by informing the jury he could not answer the question, as he did here, any inference of error is deemed rebutted and the error, if any, is therefore harmless. *Winningham v. State*, (1982) Ind., 432 N.E.2d 24; *Foster v. State*, (1977) 267 Ind. 79, 367 N.E.2d 1088. Better form would require the trial court to notify the parties and inform them of his proposed response to the jury. The response the trial judge made here, however, was a proper one and his failure to report to the defendants before making his response was harmless.

## XV

 Averhart claims there is an inconsistency in the evidence regarding wounds appearing on the body and a bullet recovered in the autopsy. There are claims in Averhart's arguments here that for political and racist reasons the State mutilated the body of Officer Yaros in an attempt to manufacture evidence against him. In the first instance these claims are not borne out by the evidence presented in this case and second, any inconsistency in the evidence would go to its weight and not its admissibility.

Averhart bases his contention on the fact that physicians trying to save Yaros' life X-rayed his chest and abdomen from the front and side in an effort to find the bullet that caused the entrance wound in his chest, and that they were unable to locate it by X-ray. This chest wound turned out to be the fatal wound to Yaros. Pathologist Custodio, who performed the autopsy, did find the bullet on closer examination and Averhart calls this mysterious, claiming it was done to sway the case against him.

Custodio testified that there were basically three wounds. His testimony was that there were three bullets that hit the body. These bullets actually left seven bullet holes on the body. One of these bullets pierced the fleshy parts of both the underside of the upper left arm and the fleshy part of the chest outside the rib

cage. It entered and exited the arm, then entered and exited the chest. Thus, although the bullet wounded the chest and the arm, it was basically one wound, with four bullet holes, two each of entrance and exit wounds. The two bullet holes in the arm are larger and more irregularly shaped than either of the ones in the chest, since by the time the bullet hit the chest it was tunneling and more flattened out. Despite the fact that these wounds looked the worst of all those pictured, they were superficial and involved no damage to internal organs. A photograph, Exhibit 316, shows these two pairs of bullet punctures which are at corresponding locations on the arm and the chest. Since this bullet left the body, it, of course, was not to be located within it.

A second bullet pierced the abdomen in the front right and traveled transversely to the right and downward exiting the right side at the area of the upper hip spur, in the area of the belt line. This bullet had also left the body.

The third, and fatal, bullet entered the right chest. Physicians trying to save Yaros would easily see the three pairs of entrance-exit wounds caused by the other two bullets and know that those bullets were gone. They would then X-ray the area of the abdominal wound to eliminate the possibility of fragments but they would be quite safe in concluding that the second bullet had left the body. However, as to bullet No. 3, the fatal bullet, they would see only the entrance wound in the chest. It is logical they would try to locate the bullet by X-raying the chest. As the State points out, they did not find this bullet by X-raying the chest for the totally logical reason that it had gone somewhere else. It is also apparent the treating physicians at this time did not have much time to search for the missing slug as they were attempting to save Yaros' life. In performing the autopsy, Custodio had more direct means to find the bullet. He followed the bullet's path inside the body. By doing this, he discovered that the bullet traveled not transversely, that is, across the body, but longitudinally downward in the body. It

hit the lung, then the liver, and virtually disintegrated the liver. Custodio found the bullet in this area and concluded that this was the direct cause of death. No one had X-rayed the area, in which the bullet was finally found, "in the lower fold of the right buttock muscle." The bullet had gone downward through nearly the entire torso.

Custodio's testimony quite clearly describes these paths of the bullets. He also drew diagrams of the bullets' paths to demonstrate his testimony. Averhart's contentions of inconsistency and contrived evidence are merely arguments concerning the weight and credibility to be given all of this evidence. His contentions present no questions of error that this Court will consider on review. *Loyd v. State*, (1980) 272 Ind. 404, 398 N.E.2d 1260 *cert. denied*, (1980) 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105.

### XVI

■ Averhart claims he was not fairly tried because he was improperly surprised by the theory of the State's case against him. It is difficult for us to discern what legal issue is presented that would demonstrate error. His claim of surprise seems to be based on the fact that he was singled out as the "trigger man" who stood over Yaros and delivered the final shot that caused his death. He first says the charging instrument is insufficient to inform him of the nature of the accusation against him. The State clearly and properly points out that the indictment here advised Defendant that he was charged with a public offense, enabled him to anticipate the proof that would be offered against him, stated all material facts necessary to constitute the offense, was clear and distinct so that there should be no difficulty in determining what evidence was relevant and informed him of the particular crime charged so that he could prepare a defense. This would be sufficient as a charging instrument. *Ricks v. State*, (1983) Ind.App., 446 N.E.2d 648. Averhart does not deny that all of this is

true. His only claim is that the evidence singled him out as the "trigger man" who killed Yaros "execution style." He made no claim of surprise during the trial or during the admission of any of the testimony and did not request a continuance on account of surprise at the trial. It is very clear from Averhart's cross-examination of the witnesses that Defendant had access to all statements, depositions, and other material indicating what the witnesses would testify to and that he was aware of how the testimony would be used. This was evident in the discovery that had been furnished to him. The testimony regarding his conduct in approaching Yaros and delivering the final shot came from witnesses who observed it. These witnesses testified as to the conduct and activities of all three defendants during the robbery and the attempted escape. The fact that this testimony did point to Averhart as the one who delivered the final fatal shot to Yaros, did not make the evidence improper in any manner. Even if Averhart was, in fact, surprised that witnesses were able to testify to this, it would not necessarily make it inadmissible or improper. A proper question might be raised had Defendant alleged surprise based on the fact that there was a failure of discovery to him of material testimony. This is not true here. The evidence shows that he was furnished all of the testimony directed toward these incidents and he alleged no surprise or failure of discovery to the trial court. He, therefore, presents no issue for our review here that would justify reversal.

### XVII

■ Averhart claims that felony murder was not proven because the shooting of Yaros took place after the robbery and not while the crime of robbery was being perpetrated. This contention has no merit. It has long been the law in Indiana that the shooting of a person by a robber or burglar while leaving the premises in an attempt to complete the crime is part of the *res gestae* of the robbery such that the shooting is, for felony murder purposes, committed in the perpetration of the robbery or burgla-

ry. It was so held in 1876 in *Bissot v. State*, (1876) 53 Ind. 408. In *Vertner v. State*, (1980) 272 Ind. 550, 400 N.E.2d 134, this Court held that felony murder was properly charged where the defendant accidentally discharged a gun while attempting to back away from the scene of a robbery. Here, Yaros was killed on the bank premises in a shootout with these defendants during their attempt to leave the Bank. This was clearly done in the perpetration of the robbery and felony murder was properly charged.

■ Averhart contends that the lack of an indictment for robbery as a separate offense somehow indicates that the killing was not in the commission of a robbery. There was no need for the State to charge the underlying robbery, particularly when it is clear that the State could not have obtained sentences for a felony murder and an armed robbery which was the underlying felony. *Williams v. State*, (1982) Ind., 430 N.E.2d 759. There is no merit whatever to Averhart's contention on this issue.

### XVIII

■ An automatic camera in the Bank photographed the scene during the perpetration of this robbery. No photographer operated it. It was activated by an employee who pushed a button in his station. The officer responsible for the camera equipment stated it had been checked earlier that morning and it had in it unexposed film ready to be used if the camera was activated. Admissibility of photographs is basically a matter of sound discretion of the court and will not be disturbed unless an abuse of discretion can be clearly shown. *Smith v. State*, (1980) Ind. App., 403 N.E.2d 869. As we have already indicated in this opinion, witness Mavis Reeves examined the photographs produced by the automatic camera and was able to identify a large number of them as truly and accurately depicting what she saw. Evidence produced at trial showed the film in the camera was unexposed before the robbery and the camera was inspected and

found to be in working order. There also was clear testimony as to the retrieval and chain of custody of the film. This is not denied by Defendants. Unrefuted testimony indicated the method used to process and print the films, and further showed they had not been retouched or altered. The testimony of Mavis Reeves, an eyewitness to the event, confirmed that the parts of the events she saw corresponded to the tale that was shown by the photographs. There were, of course, occurrences during the robbery revealed by the photographs that were outside her range of view. Under all of these circumstances it was not necessary that all and each of the photographs be supported by testimony of a witness that the photograph is an accurate representation of the witness' observation. The photographs were admissible not only as demonstrative evidence but as substantive evidence under the silent witness theory. *Torres v. State*, (1982) Ind., 442 N.E.2d 1021. In this regard it is held that the photographs speak for themselves when, as here, there is a strong showing of the photographs' competence and authenticity coupled with showing that they were not retouched or altered. An examination of the photographs show that they clearly depict the interior of the Bank and show the activities of persons during the robbery, including employees and the three perpetrators. There was ample supporting testimony here authenticating the photographs, therefore, the ruling of the trial court admitting the photographs into evidence was proper.

## XIX

■ Appellant Averhart claims there was insufficient evidence to sustain his conviction. In this issue, of course, we look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. We will determine only whether there is substantial evidence of probative value from which the jury could make its findings beyond a reasonable doubt. We neither reweigh the evidence nor judge the credibility of witnesses. *Hubbard v. State*, (1982) Ind., 437 N.E.2d

52; *Lenn v. State*, (1982) Ind., 437 N.E.2d 56; *Williams v. State*, (1982) Ind., 433 N.E.2d 769.

■ We already have set out enough facts in this opinion to demonstrate that there was strong and convincing evidence before the jury justifying their rendering the guilty verdict. Although Appellant Averhart claims much of the evidence linking him to the killing is circumstantial, it nonetheless establishes his guilt of the robbery and murder by knowingly and intentionally killing Officer Yaros. Witnesses in the Bank described the general appearance and clothing of one of the robbers as being "in a blue suit." He was described as the one who had the .44 Magnum which killed Yaros, and the man who shot from the car window and then escaped on foot. The car from which he fled was apprehended by the police and in it were found Hutson and North, along with all of the items taken from the Bank. He was followed immediately by Officer Oliver who captured him. Although he was out of Oliver's sight for a few moments, he was identified during this period by a witness as the same blue suited man who emerged from the yard in which he was being pursued by Oliver. The witness saw the blue suited man exhibit very strange behavior and saw him remove his coat and gloves and put them under a bush from which they were later recovered. Upon recovering the items, a .38 caliber gun was found, which was the one taken from the Bank guard during the robbery. The foot chase also went through the back lot of a supermarket. That same afternoon the security guard for the supermarket found a pistol behind his store. It was the same type (.44 Magnum) and of very similar appearance to the one used in the robbery. The pistol was connected to Averhart by the man who sold it to him and it was shown by ballistics tests to have fired the fatal shot into Yaros' body. Averhart's attack on several of these items of evidence does nothing more than argue as to their credibility and weight. This, of course, is not a proper consideration for this Court as

the jury makes those determinations. No question of error is presented on this issue.

## XX

■ Averhart claims a prior conviction for manslaughter was not a proper conviction to use for an aggravating circumstance in the sentencing phase of his trial. Among his objections is the fact that the conviction for manslaughter had apparently been set aside at some previous time. No issue is presented to us here because the record shows that his prior conviction for manslaughter was never presented to the jury that tried him and no attempt was made to cite it as an aggravating circumstance. There is, therefore, nothing to review as Averhart presents the issue. In his *pro se* brief, Averhart discusses at length our holding in *State v. McCormick*, (1979) 272 Ind. 272, 397 N.E.2d 276. He discusses it with reference to his claim that the grand jury should not have been given information about Averhart's prior manslaughter conviction. We already have discussed the issue of the grand jury. It has no application to the issue Averhart raises here. Furthermore, *McCormick, supra*, would not be applicable to this situation as it dealt with use of a prior murder for aggravation pursuant to Ind.Code § 35–50–2–9(b)(8) (Burns Repl.1979) where the defendant had not been convicted of the prior murder. There is clearly no issue presented here.

## XXI

Averhart raises several issues regarding the constitutionality of our death penalty statute as drafted and in its application. These issues already have been decided by this Court adverse to Averhart's contentions.

Averhart raises an issue he calls a "separation of powers" argument which he defines as giving the power to the prosecutor to define which felony murders are capital offenses. He is referring to prosecutorial discretion in charging death penalty cases. His arguments have been considered and rejected by this Court in *Williams v. State*, (1982) Ind., 430 N.E.2d 759, (1982) *appeal dismissed* 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47. *Williams* held there is no constitutional provision prohibiting prosecutorial discretion in charging the death penalty. The United States Supreme Court has explicitly held that no constitutional requirement was violated when the State prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense. *Gregg v. Georgia*, (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 *reh. denied; Proffitt v. Florida*, (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 *reh. denied; Jurek v. Texas*, (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 *reh. denied.* Following those cases, we held in *Williams, supra*, there was no violation by our prosecutor having wide discretionary power to select persons who are to be prosecuted at any level because the statute had numerous means to protect against execution of an arbitrary and capricious sentence of death. This holding was repeated in *Rowan v. State*, (1982) Ind., 431 N.E.2d 805.

Appellant Averhart claims our statute violates Art. 1, § 18 of the Indiana Constitution requiring that our penal code be based on principles of reformation and not on vindictive justice and, furthermore, that it violates the U.S. Constitution's prohibition of cruel and unusual punishment. This issue has been decided adverse to Averhart's position also. *Gregg, supra; Proffitt, supra; Jurek, supra; Williams, supra; Brewer v. State*, (1981) Ind., 417 N.E.2d 889, *cert. denied* (1982) 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384; *Judy v. State*, (1981) Ind., 416 N.E.2d 95.

■ Averhart further complains of one of the aggravating circumstances provided for in Ind.Code § 35–50–2–9(b)(6) (Burns. Repl.1979):

"The victim of the murder was a ... law enforcememt officer, and either (i) the victim was acting in the course of duty or (ii) the murderer was motivated by an act the victim performed while acting in the course of duty."

Averhart claims that this statutory provision is invalid because it does not require that the killer knew his victim was an officer on duty. There is no merit to Averhart's contention in this regard in view of the evidence in this case. The evidence here was that the officer was in full uniform, standing by a marked police vehicle, and attempting to stop the robbers in their escape from the Bank. He was lying in full uniform by his police vehicle when Averhart approached him and shot the fatal shot into him. There can be no doubt from this overwhelming evidence that Averhart knew his victim was a police officer at the time he fired on him. In fact, the State's position is well taken that there is strong inference here that Averhart fired the third fatal shot into the victim because he knew he was a policeman. Indiana's death penalty statute is not unconstitutional in any of its provisions questioned by Averhart in this issue.

## XXII

■ Averhart contends the instructions given to the jury in the penalty phase did not properly advise them. His basic complaint is that the jury was insufficiently informed as to their ability to recommend a life sentence even if the aggravating circumstances outweighed mitigating circumstances. Averhart, however, submitted no instructions and did not object to any of the court's instructions. Furthermore, Averhart has failed to set out in his brief the instruction and any objections made thereto. He has therefore waived this issue pursuant to Ind.App.R. 8.3(a)(7).

■ We note, however, in examining the record that the court did adequately and properly instruct the jury on this subject. Several instructions were given by the court explaining to them that their decision on imposition of the death penalty would be a recommendation only to the court. He advised them the court was not bound by their recommendation. He advised them of the aggravating and mitigating circumstances to be considered by them under the law, and directed them to make such considerations before they began considering whether or not the death penalty should be imposed. He advised them that if the State failed to prove beyond a reasonable doubt the existence of at least one aggravating circumstance or if they found that any mitigating circumstances outweighed the aggravating circumstances, they should not recommend the death penalty. He further instructed them that if the State did prove beyond a reasonable doubt the existence of one aggravating circumstance and they further found such aggravating circumstances outweighed any mitigating circumstances, they could recommend the death penalty be imposed. The jury was properly instructed by the court on this subject and no error is presented for our review.

## XXIII

Finally, Appellant claims the imposition of the death penalty in Indiana is improper because an inadequate review procedure in our capital punishment scheme does not provide for proportionality of this Court's review. We already have considered this contention at length and decided it adverse to Averhart's contention here. *Burris v. State*, (1984) Ind., 465 N.E.2d 171 *reh. denied; Schiro v. State*, (1983) Ind., 451 N.E.2d 1047 *cert. denied* (1983) —— U.S. ——, 104 S.Ct. 510, 78 L.Ed.2d 699; *Lowry v. State*, (1982) Ind., 434 N.E.2d 868; *Williams, supra; Brewer, supra.*

■ Having disposed of all the allegations of error raised by these defendants, it is now our responsibility to examine whether the death sentence is appropriate with regard to appellant Averhart.

In its judgment, the trial judge extensively reviewed all of the evidence presented to the jury. The judge made a finding that the testimony upon which the jury returned its verdict proved beyond a reasonable doubt that the defendant, Rufus Averhart, committed the murder by intentionally killing the victim while committing or attempting to commit robbery. He found thereby that the State had established the existence of an aggravating circumstance as provid-

ed by law under Ind.Code § 35–50–2–9(b)(1) (Burns Repl.1979). The trial court further found that the evidence clearly indicated the victim was a police officer who was employed by the city of Gary. When Yaros arrived at the Gary National Bank he was on duty, in a police uniform and in a marked squad car. The judge found the State presented evidence as to the course of duty of a police officer relative to preserving the peace and the protection of persons and property. He found it was clear the officer killed during this robbery was acting in the course of duty and found, therefore, the State of Indiana proved beyond a reasonable doubt the existence of a second aggravating circumstance as provided by law in Ind.Code § 35–50–2–9(b)(6) (Burns Repl. 1979). The trial judge then reviewed each possible mitigating circumstance listed under the above statute and found there were no mitigating circumstances.

He found Averhart had had previous involvement in crime, demonstrated by his conviction for voluntary manslaughter and for which he served a period of nine (9) years. He found there was no evidence presented that Averhart was under any type of influence of extreme mental or emotional disturbance at the time of the offense. He found there was no evidence presented that the victim, a police officer, participated or consented to the defendant's conduct. He found there was no evidence presented that the defendant, Rufus Averhart, was not an accomplice in the murder or that his participation was relatively minor. On the contrary, he found the testimony was that Averhart, while attempting to make his escape, took the time to go to the wounded officer, who posed no threat to him, and shot him at very close range with a .44 Magnum revolver, causing his death. His finding was that, therefore, Rufus Averhart was more than an accomplice or minor participant but that, in fact, he was instrumental in causing the death of the victim. He found there was no evidence that the defendant acted under the substantial domination of another person. He further found there was no evidence that the defendant's capacity to ap-

preciate the criminality of his conduct or to conform his conduct to the requirements of the law were impaired as a result of mental disease, mental defect, or of intoxication. Rather, he found that Averhart, according to the evidence, had the presence of mind once he had exited from the car during the chase, to hide his wig, sunglasses, suit coat, and gun in some bushes and then walk calmly down the sidewalk unnoticed. He found that clearly the defendant appreciated the criminality of his conduct. He found there was no evidence of any other circumstance appropriate for consideration as mitigating circumstances with regard to defendant Averhart. He then found that having considered the aggravating and mitigating circumstances, the State of Indiana had proven well beyond a reasonable doubt that at least one aggravating circumstance existed and that the aggravating circumstances outweighed any mitigating circumstances.

All of these findings of the trial judge are amply supported by the record and the transcript of the evidence presented before the court and the jury. The facts of this case indicate justification in the finding of aggravating circumstances that defendant Rufus Averhart purposely and intentionally killed Officer Yaros while Averhart was committing the crime of robbery, and that Officer Yaros was a police officer on duty at the time of the killing. Eyewitnesses observed Averhart approach the fallen body of Yaros and fire a bullet from a .44 Magnum pistol into his body that proved to be the fatal shot. The language used by many of those involved in the case, that Averhart "executed" Yaros and that he, in fact, purposely shot him because he was a police officer, is well justified. The court did further find that the convictions for murder under Count I and felony murder under Count II merged for purposes of sentencing and gave all defendants only one sentence. The trial court then found that the jury recommendation of the death penalty was proper and ordered that it be imposed on the defendant. It is clear that the trial judge complied in all respects with

the procedures of Ind.Code § 35–50–2–9 (Burns Repl.1979). We find that the death penalty was not arbitrarily or capriciously applied and that it is reasonable and appropriate.

The trial court is in all things affirmed regarding the convictions and sentences of all three defendants. The trial court is affirmed in the imposition of the death penalty with reference to Rufus Averhart. This cause is accordingly remanded to the trial court for the purpose of setting a date for the death sentence to be carried out.

GIVAN, C.J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.